[No. S145571. May 19, 2008.]

CITY OF SANTA MONICA, Plaintiff and Respondent, v.
GUILLERMO GONZALEZ, Defendant and Appellant.

GUILLERMO GONZALEZ, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CITY OF SANTA MONICA, Real Party in Interest

910

912

COUNSEL

The Law Office of Stan Stern and Stan Stern for Defendant and Appellant and for Petitioner.

Marsha Jones Moutrie, City Attorney, and Adam Radinsky, Deputy City Attorney, for Plaintiff and Respondent and for Real Party in Interest.

Mark S. Adams as Amicus Curiae on behalf of Plaintiff and Respondent and Real Party in Interest.

Gibson, Dunn & Crutcher, Scott A. Edelman, Brett H. Oberst, Michael E. Byerts, Karmen C. Schmid, Michael Anthony Brown; Michelle Williams Court, Mitchell A. Kamin, Wendy Marantz Levine, Elissa Barrett; Betsy Handler; Toby J. Rothschild, T. E. Glenn; Steve Arredondo, Naeli Jeon; David S. Pallack, Stephanie E. Haffner; Daniel Grunfeld, Lisa Jaskol; Gary B. McGaha, Kenneth W. Babock and Alexis A. Penn-Loya Bet Tzedek Legal Services, for Coalition for Economic Survival, Inner City Law Center, Inquilinos Unidos, Legal Aid Foundation of Los Angeles, Los Angeles Center for Law and Justice, Neighborhood Legal Services of Los Angeles County, Public Counsel, Public Law Center and SAJE as Amici Curiae on behalf of Plaintiff and Respondent and Real Party in Interest.

No appearance for Respondent Superior Court.

David J. Pasternak as Receiver and Respondent.

## OPINION

**BAXTER, J.**—Sections 17980.6 and 17980.7 of the Health and Safety Code[1] compose a statutory scheme providing certain remedies to address substandard residential housing that is unsafe to occupy. Pursuant to section 17980.6, an enforcement agency may issue a notice to an owner to repair or abate property conditions that violate state or local building standards and substantially endanger the health and safety of residents or the public. Section 17980.7 provides that, if the owner fails to comply with the notice despite having been afforded a reasonable opportunity to do so, the enforcement agency may seek judicial appointment of a receiver to assume control over the property and remediate the violations or take other appropriate action. We

---

[1] Unless otherwise indicated, all further statutory references are to this code.

granted review in this matter to address issues regarding the construction and application of these statutory provisions.

Examination of the legislative intent underlying these statutes leads us to conclude that an enforcement agency's failure to fully comply with the requirements specified in section 17980.6 does not necessarily invalidate a receiver's appointment under section 17980.7, and that the particular instances of noncompliance here did not invalidate the receivership orders on appeal. We also find that, in view of all the circumstances presented, the trial court below acted well within its discretion in authorizing the receiver to forgo rehabilitation of the substandard property at issue and to instead contract for demolition. Accordingly, we affirm the judgment of the Court of Appeal.

FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts, as stated in the Court of Appeal opinion and ascertained from our own review of the record, are as follows.

Guillermo Gonzalez is the owner of the real property located at 2438 Ocean Park Boulevard in Santa Monica, California. The property consists of a two-story house and a garage that has been converted into a separate dwelling unit. Gonzalez lives with his family on the first floor of the house, and he rents to tenants who occupy the garage and to various others who pay to use bunk beds on the house's second floor. The area under the staircase landing also is rented out as a separate living space.

For more than 15 years, the property has been in an extremely unsafe and unsanitary condition that endangers its occupants and neighbors. In August 1989, the City of Santa Monica (the City) filed a civil nuisance lawsuit against Gonzalez, alleging violations of the uniform building, fire, mechanical, plumbing, and electrical codes. The City obtained a default judgment requiring Gonzalez to demolish certain structures built without permits. The judgment authorized the City to do the demolition work itself if Gonzalez did not do so within 45 days. In January 1991, the City did the demolition work at a cost of $21,939.93. The City recorded a lien against the property and recovered that cost when Gonzalez refinanced the property.

In May 1997, the City filed an 85-count misdemeanor criminal complaint against Gonzalez for violations of the building, fire, housing, plumbing, and electrical codes. Gonzalez pled guilty to 15 of the counts. The court placed him on probation and ordered him to correct all code violations within 30 days. He failed to do so, and the court repeatedly found him in contempt and sentenced him to serve jail time. In 1998, Gonzalez was taken into custody

and spent a total of 280 days in jail for refusing to correct the code violations on his property.

After receiving information from its fire department, the City again inspected the property in January 2001 and found numerous continuing code violations. In May 2001, the City filed a second criminal complaint against Gonzalez. This complaint contained 32 misdemeanor counts for code violations, many of which were identical to those in the first criminal case. Gonzalez pled nolo contendere to six of the counts, and was ordered to correct all code violations on the property by May 15, 2002. The court's order authorized the City to enter the property and abate the violations if Gonzalez did not do so, and specified that any violations remaining uncorrected after 30 days would be deemed a public nuisance without the necessity of further hearing, order, or action by the City. The court placed Gonzalez on probation until April 2005.

On May 15, 2002, representatives from the City's building and safety department inspected the property pursuant to the trial court order. Once again they found numerous continuing code violations. On May 23, 2002, the City personally served Gonzalez with a "Notice and Order to Comply," dated May 21, 2002 (hereafter sometimes the May 21, 2002 Notice). This document listed all the outstanding violations and stated that Gonzalez was "hereby directed to obtain the required permits from the Building and Safety Division, and make the necessary repairs. A re-inspection will be conducted on **June 20, 2002**, to ensure compliance with this notice. [¶] Pursuant to . . . Court Order, if you fail[] to comply with this notice the City of Santa Monica will take actions to make the necessary corrections to eliminate the described deficiencies, and any other that may exist at the property."

Two years later, on June 21, 2004, city inspectors conducted a followup inspection of the property and found that none of the code violations in the May 21, 2002 Notice had been corrected. On June 30, 2004, the city attorney filed a declaration of probation violation based on Gonzalez's failure to correct the code violations. On November 17, 2004, the court found Gonzalez in violation of his probation.

Pursuant to section 17980.7, subdivision (c) (section 17980.7(c)), on December 6, 2004, the City filed the instant "Petition for Appointment of Receiver and Other Relief." The petition alleged that numerous serious code violations on the property presented a substantial threat to the health and safety of the residents and the nearby community. These included: accumulation of combustible debris and rubbish in the exterior of the property (U. Fire Code, § 1103.2.1); use of temporary extension cords in place of permanent approved wiring (*id.*, § 8506.1; Nat. Electrical Code, § 400-8); no heating in

the units (Cal. Building Standards Code, § 310.11; see Cal. Code Regs., tit. 24); renting out multiple beds on the second floor in violation of permissible occupancy rules and prior court orders (Cal. Building Standards Code, § 310.1; Santa Monica Mun. Code, § 8.08.030); accumulation of litter and debris and failure to maintain the property in a safe and sanitary condition (Health & Saf. Code, § 17920.3, subd. (j); Santa Monica Mun. Code, § 7.48.070); failure to have operable and proper windows in all sleeping rooms (Cal. Building Standards Code, § 310.4); nonoperational and unregistered vehicles parked in the backyard (Santa Monica Mun. Code, § 8.96.220); and maintaining an attractive nuisance (§ 17920.3, subd. (c); Santa Monica Mun. Code, § 8.96.050). The petition alleged that all previous efforts to compel Gonzalez to correct the violations had failed and that a receiver was necessary to abate the serious code violations. Concurrent with its petition, the City filed an ex parte application for a temporary restraining order to enjoin Gonzalez from encumbering or transferring the property pending a hearing on the City's separately filed notice and motion for appointment of a receiver to take possession.[2]

On December 6, 2004, the trial court issued the temporary restraining order and set the City's motion for appointment of a receiver for a hearing on January 6, 2005. On December 9, Gonzales was personally served with notice of this motion, in which the City contended it was "likely" the receiver and the court might order "complete demolition of the structures" on the property due to their "extreme and chronic unsafe conditions" and the comparative costs of rehabilitation and demolition.

Gonzalez appeared at the scheduled January 6, 2005 hearing without an attorney and without having filed an opposition to the petition and motion. He claimed: "My attorney was supposed to be here. But, apparently, he had some other things to do." The court stated for the record that it had not heard from the attorney, and proceeded with the hearing in his absence. The court then explained to Gonzalez that due to his continued refusal to remedy the code violations despite the two previous criminal actions and the numerous civil citations, and as a last resort, the City was seeking to take over and sell his property. Once the property was sold, and the encumbrances paid off, Gonzalez would get whatever was left.[3]

---

[2] On December 2, 2004, the City personally served Gonzalez with notice and a copy of the petition, and gave him telephonic notice of its ex parte application for the temporary restraining order.

[3] Downey Savings and Loan Association, F.A. (Downey Savings), held an interest in the property as the first priority lienholder, and also was served with the City's petition. Although Downey Savings opposed the petition primarily on the ground that receiver certificates should not be senior in priority to its existing secured loan, it expressed support for demolition of the property.

The court then issued an order appointing David J. Pasternak as receiver, with full powers granted receivers under section 568 of the Code of Civil Procedure and section 17980.7(c) of the Health and Safety Code, including the power to "rehabilitate or demolish" the property consistent with plans submitted to the court. The order included findings that (1) Gonzalez's property was "substandard and a public nuisance" and "maintained in a manner that violates the state building standards and the Santa Monica Municipal Code"; (2) the violations were so extensive and of such a nature that the health and safety of the property's occupants, neighboring residents, and the general public were substantially endangered; (3) the City, as a local enforcement agency, properly issued a notice to repair and abatement order to Gonzalez; (4) Gonzalez failed to comply with the City's notice within a reasonable time after its issuance and had been afforded a reasonable opportunity to correct the conditions cited therein; (5) the substandard conditions of the property would likely persist unless the court appointed a receiver to take possession of the property and to undertake responsibility for its rehabilitation; and (6) Gonzales was properly served and given notice prior to the filing of the petition for appointment of receiver.

Thereafter, Gonzalez substituted in private counsel and moved for reconsideration of the order appointing a receiver. His motion made several assertions: (1) it would cost only $27,400 to bring the property up to code; (2) the nonoperational vehicles and the operational kitchen appliances had been removed from outside the property; (3) the City had not sought such a drastic remedy for code violations in 15 years; and (4) the substantial costs of a receivership were unwarranted because Gonzalez now had the "guidance of professional counsel."

The City contended reconsideration should be denied because the only new fact Gonzalez presented was that two vehicles and some debris had been removed from the property's backyard after the January 6 hearing. In his reply, Gonzalez asserted for the first time that he had been denied procedural due process by the City's failure to issue an order or notice to repair or abate and failure to provide a reasonable opportunity to respond before a receiver was appointed.

The court denied the reconsideration motion, concluding the newly proffered facts and law could have been presented at the original January 6, 2005 hearing. The court additionally found that, while the City's May 21, 2002 Notice did not "fully comply" with section 17980.6, "[t]his is an egregious case where [Gonzalez] has been involved in criminal matters and numerous civil matters regarding the conduct and condition of this property. He certainly had more than ample notice of the building code violations and the other safety code violations that are existent on his property. [¶] So, under the

circumstances, the court does not find that there is any lack of notice on behalf of [Gonzalez]. I think he clearly knew what was going on. This is an ongoing process."

Over a month later, the receiver filed an application for issuance of an order authorizing him to take specified actions, including (1) entering into a loan commitment agreement and borrowing funds; (2) entering into a contract to demolish the structure on the property; (3) paying relocation benefits to the tenants on the property; and (4) paying Gonzalez $2,000 per month for living expenses as long as he does not interfere with the receivership. Based on bids the receiver obtained, the application represented that rehabilitation of the structure would cost approximately $145,000, which would yield a property worth $450,000 and result in equity of approximately $305,000. Alternatively, demolition of the current structure would cost $54,000, which would yield a lot worth $509,000 and result in equity of $455,000. Thus, the property would be worth $59,000 more as a vacant lot ($509,000) than with its existing structures after correction of the code violations ($450,000), and the equity in the property after demolition ($455,000) would be nearly 50 percent higher than the equity if the structures were repaired ($305,000). In presenting this information, the receiver cautioned the court it was "more likely that the estimated rehabilitation cost will increase significantly as additional problems are discovered as the work progresses, and it would result in significantly greater costs of administration for this receivership because both the extent of the work and the time to complete that work would be greater than the alternative of demolishing the structure."[4]

The City did not take a position on the receiver's application to pursue demolition. Gonzalez, however, filed an opposition that simply expressed his "fervent wish" to remain living at the property with his family and to spare the residence from demolition. He claimed he should be permitted to make that choice, even though it "may not necessarily be 'the best investment.' " Gonzalez did not make any showing regarding his ability to pay for the repairs or management of the property in the future. Previously, however, he had filed a declaration in the action stating he was unemployed and had no other assets or income apart from rental income from the property.

On May 2, 2005, the court held a hearing and considered the parties' evidence and arguments. The court granted the receiver's application for

---

[4] The City also provided evidence indicating that rehabilitation would cost more than the bid amount of $145,000. Specifically, the City's senior code compliance officer estimated it would cost $350,000 to bring the property into code compliance; this figure was $200,000 higher than the bid obtained by the receiver and did not include the cost of preparing plans or permitting fees. Additionally, the receiver's equity estimates did not appear to take into account the balance remaining on the Downey Savings loan. (See *ante*, fn. 3.)

authorization to take the specified actions, determining that the property "[was] uninhabitable in its current position and that it [was] not economically feasible to rehabilitate the structure." On Gonzalez's application, the court waived the appeal bond and temporarily stayed the May 2, 2005 order.

Thereafter, Gonzalez applied to the Court of Appeal for a stay of all trial court proceedings and appealed both the January 6, 2005 order appointing the receiver and the May 2, 2005 order granting the receiver's application. He also petitioned for a writ of mandate/prohibition to invalidate the order appointing the receiver and all subsequent orders. As relevant here, Gonzalez contended the order of appointment violated his due process rights and was void because the City failed to issue an order or notice to repair or abate in conformance with sections 17980.6 and 17980.7. Because the appointment order was void, he argued, the subsequent order authorizing the receiver to contract for demolition also was void, and even if not void, such authorization constituted an abuse of discretion.

The Court of Appeal ordered all proceedings in the trial court stayed and agreed to consider Gonzalez's writ petition concurrently with his appeals. The court unanimously affirmed the receiver's appointment, finding the City sufficiently complied with sections 17980.6 and 17980.7 to protect Gonzalez's due process rights. The justices, however, disagreed on the issue of demolition. The majority determined the trial court did not abuse its discretion in approving the less expensive and more profitable option of demolishing and selling the property, rather than the more expensive and less profitable option of rehabilitation. Conversely, the dissenting justice concluded the court's approval of demolition over Gonzalez's objection was arbitrary and unreasonable because there was ample equity in the property to pay for correction of all code violations. In his view, accepting the economic consequence of rehabilitation—which would leave $150,000 less in equity than demolition and sale—was a decision properly left to Gonzalez, so long as the property was made safe and sanitary. The Court of Appeal affirmed both orders, denied the writ petition, and vacated the stay.

We granted Gonzalez's petition for review and stayed all proceedings in the trial court pending further order by this court.

DISCUSSION

Gonzalez contends the trial court acted without jurisdiction and in error when it appointed a receiver and then authorized the receiver to contract for demolition of his property over his objection. He bases these contentions on the City's alleged failure to comply with sections 17980.6 and 17980.7 and

on the circumstance that his property has sufficient equity to pay for correction of all code violations.

A. *Sections 17980.6 and 17980.7*

Gonzalez's claims regarding the City's alleged noncompliance with sections 17980.6 and 17980.7 fall into the two general categories below.

1. *Notice of Potential Receivership*

Gonzalez first contends that, under sections 17980.6 and 17980.7, the City was required to provide notice that receivership was a potential consequence of failure to correct the substandard condition of his property. In his view, the City's noncompliance on this point violated his due process rights and deprived the trial court of jurisdiction to appoint a receiver or to authorize receiver action.

■ Whether these statutes require the type of notice claimed, and whether the City's purported noncompliance invalidates the trial court's orders, are issues that must be resolved by ascertaining the legislative intent. When construing statutes, our goal is " 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' " (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567 [67 Cal.Rptr.3d 468, 169 P.3d 889] (*Gattuso*), quoting *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) We first examine the words of the statute, "giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent." (*Gattuso, supra*, 42 Cal.4th at p. 567.) If the statutory language is ambiguous and susceptible of differing constructions, we may reasonably infer that the legislators intended an interpretation producing practical and workable results rather than one resulting in mischief or absurdity. (See *In re Reeves* (2005) 35 Cal.4th 765, 771, fn. 9 [28 Cal.Rptr.3d 4, 110 P.3d 1218], and cases cited.) It is a fundamental tenet of statutory construction that we must give the statute a *reasonable* construction conforming to legislative intent. (*Gattuso, supra*, 42 Cal.4th at p. 567.) With these principles in mind, we turn first to the language of sections 17980.6 and 17980.7.

Section 17980.6 provides in full: "If any building is maintained in a manner that violates any provisions of this part, the building standards published in the State Building Standards Code relating to the provisions of this part, any other rule or regulation adopted pursuant to the provisions of this part, or any provision in a local ordinance that is similar to a provision

in this part, and the violations are so extensive and of such a nature that the health and safety of residents or the public is substantially endangered, the enforcement agency may issue an order or notice to repair or abate pursuant to this part. Any order or notice pursuant to this subdivision shall be provided either by both posting a copy of the order or notice in a conspicuous place on the property and by first-class mail to each affected residential unit, or by posting a copy of the order or notice in a conspicuous place on the property and in a prominent place on each affected residential unit. The order or notice shall include, but is not limited to, all of the following: [¶] (a) The name, address, and telephone number of the agency that issued the notice or order. [¶] (b) The date, time, and location of any public hearing or proceeding concerning the order or notice. [¶] (c) Information that the lessor cannot retaliate against a lessee pursuant to Section 1942.5 of the Civil Code."

██ Given its ordinary and usual meaning, the first sentence of section 17980.6 plainly contemplates that, where, as here, a residential building is maintained in a manner that violates local ordinance provisions similar to statutory and regulatory residential building standards, and the violations are so extensive that they substantially endanger public health and safety, a local enforcement agency such as the City may issue an order or notice demanding that the property owner correct the violations listed. The second sentence of section 17980.6 provides that copies of the order or notice (hereafter sometimes the notice to repair) "shall be" posted in a conspicuous place on the property and either (1) served by first-class mail to each affected residential unit; or (2) posted in a prominent place on each affected residential unit.

Section 17980.7 picks up where section 17980.6 leaves off, providing in relevant part: "If the owner fails to comply within a reasonable time with the terms of the order or notice issued pursuant to Section 17980.6, the following provisions shall apply: [¶] . . . [¶] (c) The enforcement agency, tenant, or tenant association or organization may seek and the court may order, the appointment of a receiver for the substandard building pursuant to this subdivision. In its petition to the court, the enforcement agency, tenant, or tenant association or organization shall include proof that notice of the petition was served not less than three days prior to filing the petition . . . to all persons with a recorded interest in the real property upon which the substandard building exists. . . ." (§ 17980.7(c).) In deciding whether to appoint a receiver, "the court shall consider whether the owner has been afforded a reasonable opportunity to correct the conditions cited in the notice of violation." (§ 17980.7, subd. (c)(1).)

██ By its terms, section 17980.7 contemplates that two different types of notice must be given to the property owner before a receiver may be appointed. The first type of notice, reflected in the introductory clause of

section 17980.7, refers to the enforcement agency's notice to repair issued pursuant to section 17980.6. This clause makes clear that if the owner fails to comply with the notice to repair within a reasonable time, an enforcement agency, a tenant, or a tenant association or organization may seek an order from the trial court appointing a receiver. (§ 17980.7(c).) This clause also serves as a predicate for other judicial remedies, such as an order for statutory penalties (§ 17980.7, subd. (a)) and an order affecting state tax deductions and benefits (§ 17980.7, subd. (b)(1), (2)).

■ The second type of notice, reflected in section 17980.7(c), addresses the particular notice required when a receivership is sought: the party seeking appointment of a receiver "shall include proof [in the petition] that notice of the petition was served not less than three days prior to filing the petition" to all persons with a recorded interest in the property. (§ 17980.7(c).) Given its ordinary and usual meaning, this statutory language is reasonably understood as meaning that an enforcement agency such as the City cannot commence a receivership proceeding unless it demonstrates that it gave the property owner at least three days' notice of the receivership petition.

■ Whether viewed separately or together, the terms of section 17980.6 and section 17980.7 do not require the notice to repair to inform the property owner that receivership is a potential consequence of failure to correct or abate the identified violations. Section 17980.6 authorizes an enforcement agency to issue a notice to repair, but it makes no specific reference to receivers or receivership proceedings, or to any of the other judicial remedies made available in section 17980.7. Section 17980.7, on the other hand, expressly authorizes an enforcement agency and others to seek a receivership when an owner fails to comply with a section 17980.6 notice to repair, but the notice it requires is simply notice that the receivership petition was served on all persons with a recorded interest in the property at least three days before the petition was filed. (§ 17980.7(c).) Thus, while Gonzalez was statutorily entitled to notice that failure to correct the substandard condition of his property might result in the appointment of a receiver, the City duly afforded that notice when it served Gonzalez in accordance with section 17980.7(c).[5]

### 2. *Notice and Content Requirements of Section 17980.6*

Gonzalez next argues the trial court's appointment of a receiver on January 6, 2005, was improperly predicated on the City's May 21, 2002 Notice, which he claims did not meet the notice and content requirements of section 17980.6 in the following particulars. First, the May 21, 2002 document bore the caption "Notice and Order to Comply," instead of "Order or Notice to

---

[5] Gonzalez does not challenge his three-day notice pursuant to section 17980.7(c).

Repair or Abate." Second, the document did not identify either section 17980.6 or section 17980.7 among the numerous claimed code violations, and did not contain information explaining that the lessor cannot retaliate against a lessee pursuant to Civil Code section 1942.5 (§ 17980.6, subd. (c)). Third, the City did not comply with section 17980.6's provisions for conspicuous posting and/or first-class mailing of the document. Fourth, the May 21, 2002 Notice made no reference to the City's intent to seek a receivership in 2004, or to the January 6, 2005 receivership hearing, or to any code or ordinance violations existing on his property at any point in time between June 21, 2004 (when the City returned to inspect his property for compliance with the May 21, 2002 Notice), and the subsequent receivership hearing.[6]

Three of the foregoing contentions fail because the perceived requirements do not exist. As already discussed, section 17980.6 does not require a notice to repair to inform the property owner that receivership is a potential consequence of failure to correct or abate the identified violations. Nor does the statute call for disclosure of intent to seek a receivership at some point in the future.

■ Moreover, while it might have been better practice for the City's May 21, 2002 Notice to have identified its statutory basis, and we would encourage enforcement agencies to have their notices to repair do so henceforth, the terms of section 17980.6 do not specify such a requirement.

■ Finally, section 17980.6 does not mandate the specific caption "Order or Notice to Repair or Abate." True, section 17980.6 expressly states that an "enforcement agency may issue an *order or notice to repair or abate* pursuant to this part." (Italics added.) But the phrase appears to have no particular talismanic significance. Indeed, the provisions of section 17980.7 do not even employ the phrase, but instead use other descriptive terms for purposes of reference, such as the "order or notice to correct the condition that caused the violation pursuant to Section 17980.6" (§ 17980.7, subd. (b)(2)) and the "notice of violation" (§ 17980.7, subd. (c)(1), (4)(C), (D), (F) & (G), (9)).

■ Viewed in context, section 17980.6 contemplates that, when a residential property is in violation of state or local building codes, and the violations are so extensive that they pose a serious health and safety risk, the enforcement agency may serve a notice to the owner to correct the violations

---

[6] Gonzalez also complains the notice did not include the date, time, or location of any public hearing or proceeding concerning its subject matter, as required by section 17980.6, subdivision (b). We note, however, there was no hearing or proceeding scheduled at the time the City served the May 21, 2002 Notice. The document did state that a "re-inspection" would be conducted on June 20, 2002, to verify compliance with the notice.

and bring the property into code compliance within a reasonable time. This is exactly what the City's May 21, 2002 Notice and Order to Comply did: it informed Gonzalez in unambiguous terms that (1) his property violated numerous identified building standards and code sections; and (2) he was directed to obtain the required permits and to make the necessary repairs by June 20, 2002.

■ Gonzalez's remaining contentions require more extensive analysis. As Gonzalez points out, section 17980.6 states that any order or notice pursuant to its terms "*shall* be provided" by posting a copy of the order or notice in a conspicuous place on the property, and also by either first-class mail delivery to each affected residential unit or posting a copy in a prominent place on each affected residential unit. (Italics added.) Section 17980.6 further provides that the order or notice "*shall* include" information explaining the lessor cannot retaliate against a lessee. (§ 17980.6, subd. (c), italics added.) It is undisputed that the May 21, 2002 Notice was neither conspicuously posted nor mailed, and that it omitted mention of the retaliation prohibition. Gonzalez argues these deficiencies invalidate the trial court's orders appointing the receiver and authorizing demolition of his property.

■ "Traditionally, the question of whether a public official's failure to comply with a statutory procedure should have the effect of invalidating a subsequent governmental action has been characterized as a question of whether the statute should be accorded 'mandatory' or 'directory' effect. If the failure is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory." (*People v. McGee* (1977) 19 Cal.3d 948, 958 [140 Cal.Rptr. 657, 568 P.2d 382] (*McGee*).)

The "mandatory-directory" dichotomy is linguistically similar but analytically distinct from the "mandatory-permissive" (or "obligatory-permissive") dichotomy. (*McGee, supra*, 19 Cal.3d at pp. 958–959.) For purposes of the mandatory-permissive dichotomy, the word "mandatory" refers to an obligatory procedure that a governmental entity is required to follow, as opposed to a permissive procedure that the entity may follow or not, as it chooses. (*Ibid.*) Here, the City appears to acknowledge that section 17980.6 is obligatory to the extent it calls for posting and/or mailing of a notice to repair and reference to the retaliation prohibition.

■ In the mandatory-directory context, however, the "mandatory" or "directory" designation does not refer to whether a particular statutory requirement is obligatory or permissive, but instead denotes " 'whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural

requirement relates.' " (*McGee, supra,* 19 Cal.3d at p. 959.) In California, it is not uncommon for obligatory statutory provisions to be accorded only directory effect. (*Morris v. County of Marin* (1977) 18 Cal.3d 901, 908–909, fn. 4 [136 Cal.Rptr. 251, 559 P.2d 606] (*Morris*).)

Courts determine whether an obligatory statutory provision should be given mandatory or directory effect by ascertaining the legislative intent. (*McGee, supra,* 19 Cal.3d at p. 962, citing *Morris, supra,* 18 Cal.3d at pp. 909–910.) Of course, when the Legislature imposes particular statutory requirements, it generally does not intend for them to be disregarded. (*Cox v. California Highway Patrol* (1997) 51 Cal.App.4th 1580, 1587 [60 Cal.Rptr.2d 159].) But where, as here, " 'the consequences of not obeying them in every particular are not prescribed, the courts must judicially determine them.' " (*Ibid.,* quoting 3 Sutherland, Statutory Construction (5th ed. 1992) § 57.01, p. 2.)

■ There is " 'no simple, mechanical test' " for making this determination. (*McGee, supra,* 19 Cal.3d at pp. 961–962.) Invariably, "courts look to the procedure's purpose or function. If the procedure is essential to promote the statutory design, it is 'mandatory' and noncompliance has an invalidating effect. If not, it is directory." (*Cal-Air Conditioning, Inc. v. Auburn Union School Dist.* (1993) 21 Cal.App.4th 655, 673 [26 Cal.Rptr.2d 703].) In this regard, " ' "the construction of particular provisions must be left for determination in such light as the obvious purpose they were intended to accomplish may afford. . . . No one should be at liberty to plant himself upon the nonfeasances or misfeasances of officers . . . *which in no way concern himself,* and make them the excuse for a failure on his part to perform his own duty. On the other hand, he ought always to be at liberty to insist that directions which the law has given to its officers *for his benefit* shall be observed." ' " (*McGee, supra,* 19 Cal.3d at p. 962, first italics added; see, e.g., *People v. Gonzales* (1986) 188 Cal.App.3d 586, 590 [233 Cal.Rptr. 204] [because negotiated plea statutes were designed to benefit the public and not criminal defendants, the defendant lacked standing to raise the issue of statutory noncompliance].)

The question here is whether Gonzalez may invoke the statutory requirements for posting and/or mailing and inclusion of the retaliation prohibition as a basis for invalidating the receivership orders. Under the foregoing authorities, we must ascertain whether these statutory provisions are intended for his benefit or protection as a property owner, or instead are designed to serve some other purpose.

■ By requiring that any order or notice pursuant to its terms be posted "in a conspicuous place on the property," section 17980.6 provides for notice reasonably calculated to apprise the owner and others that the property has

been found by the applicable enforcement agency to be in violation of specified building standards and that repair or abatement of the violations is demanded. Because it would be unreasonable and a violation of due process to hold an owner accountable for building code violations and repair demands without providing adequate notice of such matters, it stands to reason that the conspicuous-posting requirement is an essential component of section 17980.6 (and, by implication, of § 17980.7), intended primarily for the protection of the owner. ■ In this case, however, the City substantially complied with this requirement—fully satisfying its essential purpose and objective—by personally serving Gonzalez with the May 21, 2002 Notice. (See *Cal-Air Conditioning, Inc. v. Auburn Union School Dist.*, *supra*, 21 Cal.App.4th at pp. 667–671 [finding substantial compliance doctrine applicable to two-day written notice requirement specified in public contracting statute].) ■ Where, as here, an enforcement agency personally serves a property owner with a notice to repair, the agency's failure to conspicuously post the same notice provides the owner no basis for relief. (Cf. *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 313 [94 L.Ed. 865, 70 S.Ct. 652] ["[p]ersonal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding"].)

We next turn to the statutory requirements for (1) first-class mailing to, or conspicuous posting on, each affected residential unit and (2) explaining that lessors are prohibited from retaliating. On their face, these requirements appear directed toward benefiting the tenants who occupy a substandard building. This understanding is confirmed by the history of the 1999 legislative amendment that added these requirements to section 17980.6. The basis for the legislation was explained as follows: "When property owners don't maintain residential buildings, local building officials enforce building code and health and safety code violations. In some cases, the buildings are substandard and unsafe to occupy, and local building officials may be in the process of requiring the building to be abandoned. But the tenants are not aware of the building conditions and not aware that they may have to vacate their homes. In areas of the state where affordable housing is not available, tenants have a difficult time finding another place to live. This bill improves the noticing requirements to tenants who may have to vacate their home." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 942 (1999–2000 Reg. Sess.) as amended Aug. 23, 1999, pp. 2–3.)

Meanwhile, the legislative history of section 17980.6 as originally enacted discloses the Legislature's substantial concern over the "inadequate enforcement of State Building Codes in regard to substandard housing" and its intent to provide "new enforcement measures to rehabilitate and maintain existing housing that currently endangers the health and safety of residents or the

public." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 2799 (1987–1988 Reg. Sess.) as amended Aug. 29, 1988, p. 3; see Assem. Com. on Housing and Community Development, Analysis of Sen. Bill No. 2799 (1987–1988 Reg. Sess.) as amended June 27, 1988, p. 3.) Hence, the present version of section 17980.6 serves to enhance the ability of local enforcement agencies to require owners to remediate substandard housing conditions that pose an immediate health and safety threat and to improve the notice given to tenants regarding matters that may directly affect them.

■ The foregoing history undermines any contention that the provisions requiring notice to each affected unit and reference to the retaliation prohibition exist to protect property owners such as Gonzalez. Because these provisions are intended for the informational benefit of tenants, Gonzalez is in no position to rely on them as a basis for invalidating the receivership orders. (*McGee, supra*, 19 Cal.3d at p. 962; *People v. Gonzales, supra*, 188 Cal.App.3d at p. 590.)[7] Furthermore, we remain mindful that sections 17980.6 and 17980.7 were enacted to provide meaningful enforcement mechanisms in situations where the substandard condition of a residential building is found to substantially endanger the health and safety of the occupants or the public. It would be an absurd application of these sections if owners could invoke the tenant-related notice requirements as the basis for invalidating agency efforts to abate the serious code violations that directly threaten tenant health and safety.

■ Nonetheless, the statutory scheme clearly seeks to ensure that property owners are afforded due process before judicial appointment of a receiver. As section 17980.7 declares, "[n]othing in this section shall be construed to deprive an owner of a substandard building of all procedural due process rights guaranteed by the California Constitution and the United States Constitution, including, but not limited to, receipt of notice of the violation claimed and an adequate and reasonable period of time to comply with any orders which are issued by the enforcement agency or the court." (§ 17980.7, subd. (c)(14).) There is thus no question an owner may contest a section 17980.7 receivership if fair notice of a claimed substandard condition was lacking or if a reasonable opportunity to correct the cited condition was not afforded. (§ 17980.7, subd. (c)(1), (14).)

---

[7] Gonzalez has made no attempt to show how the City's noncompliance on these points disadvantaged him or prejudiced his interests. Nor does any prejudice to Gonzalez's tenants appear. There is no allegation in this case that Gonzalez illegally retaliated against any tenant. Moreover, the record reflects that, consistent with his obligations under a local relocation assistance ordinance and section 17980.7, subdivision (c)(6), the receiver acted to protect the tenants' interests by seeking court authorization to pay $5,500 in relocation benefits to the tenants renting the garage unit and $5,500 to the tenants renting the bunk beds on the second floor of the home.

Gonzalez relies on *Jones v. Flowers* (2006) 547 U.S. 220 [164 L.Ed.2d 415, 126 S.Ct. 1708] (*Jones*) to argue that due process requires the government to apprise the property owner of the potential consequence that a court will appoint a receiver for his property, or otherwise deprive him of his property, if he should fail to take the necessary steps to correct substandard conditions.

 Generally, due process requires that "the government provide notice and an opportunity to be heard before it deprives a person of property." (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 400 [41 Cal.Rptr.2d 658, 895 P.2d 900]; see *Matera v. McLeod* (2006) 145 Cal.App.4th 44, 60 [51 Cal.Rptr.3d 331].) But *Jones, supra,* 547 U.S. 220, cannot be read as compelling the government to provide advance notice of all possible civil remedies that might be pursued in the event of noncompliance with a legal obligation.

*Jones, supra,* 547 U.S. 220, arose in the context of a tax sale to recoup delinquent property taxes. In addressing the issue of notice, *Jones* acknowledged that "[d]ue process does not require that a property owner receive actual notice before the government may take his property." (*Id.* at p. 226.) *Jones* concluded, however, that when a mailed notice of a tax sale was returned unclaimed, due process required the state to take additional reasonable steps to attempt to provide the property owner notice and an opportunity to be heard before selling his property to satisfy a tax debt, if it was practicable to do so. (*Id.* at p. 225.) Thus, the issue in *Jones* was not whether the state was obligated to give advance warning to an owner that future nonpayment of property taxes might result in the seizure and sale of the property to satisfy the tax debt, but whether the state made sufficient additional efforts to provide an owner with notice of an impending tax sale after it became aware that its prior attempt in mailing notice had failed. (*Id.* at pp. 226–227.)

Here, the record discloses the following undisputed facts. A representative of the City personally served Gonzalez on May 23, 2002, with a written Notice and Order to Comply dated May 21, 2002. That notice identified numerous building code violations on Gonzalez's property and directed him to obtain the required permits and make the necessary repairs. It further informed Gonzalez that an inspection would occur on June 20, 2002, "to ensure compliance" with the notice and that, in the event of noncompliance, the City would "take actions to make the necessary corrections to eliminate the described deficiencies, and any other that may exist at the property." The City eventually conducted the followup inspection on June 21, 2004, and at that time ascertained the property was "still being maintained in a substandard condition and all of the same Code violations described [in the May 21, 2002 Notice] still exist[ed]." On December 2, 2004, the City personally

served Gonzalez and Downey Savings with a copy of its petition for appointment of a receiver. The City then filed its petition on December 6, 2004.

Based on this record, it is fair to conclude that the May 21, 2002 Notice put Gonzalez on ample notice of the claimed violations and that the City ultimately afforded Gonzalez more than an adequate and reasonable period of time to correct them. There also is no question that Gonzalez received timely notice of the City's receivership petition and motion, and that he in fact exercised his right to be heard on the receivership matter. Although Gonzalez complains the City waited a full two years to inspect his property for compliance with the May 21, 2002 Notice, there was no unfairness resulting from the delayed inspection because Gonzalez remained on probation and accountable for the same code violations. Moreover, there is nothing to indicate that the delay in this case was prejudicial.[8] In view of all the circumstances, we cannot say the trial court appointed the receiver in derogation of Gonzalez's due process rights or in violation of the due process principles articulated in *Jones, supra,* 547 U.S. 220.

Gonzalez also relies on *D & M Financial Corp. v. City of Long Beach* (2006) 136 Cal.App.4th 165 [38 Cal.Rptr.3d 562] (*D & M Financial*), in which the plaintiff trust deed holder prevailed in an inverse condemnation action after a city demolished a substandard apartment building. Prior to the time the plaintiff had acquired its interest in the property, the city had determined the building was a public nuisance and served all then interested parties with a notice of hearing that included an order that the owner demolish or rehabilitate the building. This notice was not recorded, and repairs made to the property were insufficient. The following year, the city was made aware that a change in ownership had occurred and that the plaintiff had acquired an interest in the property. Despite this knowledge, the city did not send the plaintiff a 10-day notice of intent to demolish the building, and the notice it did provide did not reach the plaintiff until the day before (or the day of) the demolition.[9] Under these circumstances, the Court of Appeal affirmed the trial court judgment, holding the city violated the plaintiff's due process rights by failing to provide adequate notice prior to the demolition. In so holding, the court concluded that a "Declaration of Substandard Property," which the city had recorded the previous year with the county recorder, did not provide adequate notice because it made no reference to

---

[8] For example, Gonzalez made no attempt to show or even argue that any or all of the violations listed in the May 21, 2002 Notice had been corrected at some point in time before the City returned to inspect his property on June 21, 2004.

[9] The opinion initially suggests the plaintiff received notice the day before demolition began (*D & M Financial, supra,* 136 Cal.App.4th at p. 173), but later indicates notice was received on the day demolition occurred (*id.* at p. 182).

demolition and did not advise that demolition would occur or was even contemplated if the public nuisance was not abated. (136 Cal.App.4th at pp. 178–179.)

D & M Financial is inapposite and does not alter our conclusion. Among other things, that case did not involve a receivership proceeding under section 17980.7, but rather a city demolition authorized by ordinance. Moreover, the plaintiff in that case had no prior notice that demolition of the substandard property was sought: "From the time it acquired its interest in the . . . property on February 15, 2001, until it received the 48-hour notice and the inspection warrant on August 13, 2001 [the day before demolition began], D & M Financial received no notice from the City that the City had commenced any proceeding to demolish the property." (D & M Financial, supra, 136 Cal.App.4th at p. 173.)

Gonzalez, of course, had been on notice for years that his property was uninhabitable and in violation of building, fire, housing, plumbing, and electrical codes. His steadfast refusal to obey orders to correct these violations resulted in criminal convictions and contempt citations, and landed him in jail for a number of months. Indeed, at all relevant times beginning with the date the City personally served its May 21, 2002 Notice and Order to Comply, Gonzalez was on probation for the same code violations. After Gonzalez did not comply with the May 21, 2002 Notice, the City timely served him with its petition for appointment of a receiver and with notice and motion for appointment of a receiver to be heard on January 6, 2005. The motion papers served on Gonzalez on December 9, 2004, made clear that the City contemplated "complete demolition of the structures" on the property in view of "the extreme and chronic unsafe conditions," with Gonzalez receiving the net proceeds available after demolition and sale. The trial court appointed a receiver on January 6, 2005, and thereafter the receiver provided Gonzalez timely notice of a hearing on his application for an order to contract for demolition of the property. Unlike the situation in D & M Financial, no violation of due process appears in this case because Gonzalez was provided "with notice, with the opportunity to be heard, and with the opportunity to correct or repair the defect before demolition." (D & M Financial, supra, 136 Cal.App.4th at p. 174.)[10]

---

[10] It follows from our analysis that neither Jones, supra, 547 U.S. 220, nor D & M Financial, supra, 136 Cal.App.4th 165, supports Gonzalez's related contention that, in order to preserve the constitutionality of sections 17980.6 and 17980.7, they must be construed as implicitly requiring notice that receivership is a potential consequence of failure to correct the condition of substandard property.

## B. *Order Authorizing Contract for Demolition*

Gonzalez contends that, in any event, the trial court's order authorizing the receiver to contract for demolition was not supported by the law and must be reversed. In addressing this contention, it is helpful to review a few basic principles relating to receiverships.

 It has long been recognized that a receiver is an agent and officer of the appointing court. (*People v. Stark* (2005) 131 Cal.App.4th 184, 204 [31 Cal.Rptr.3d 669] (*Stark*); see *Lesser & Son v. Seymour* (1950) 35 Cal.2d 494, 499 [218 P.2d 536] (*Lesser & Son*).) As an officer of the court, a receiver is not an agent of any particular party to the action, but represents all persons interested in the property. (*Security Pacific National Bank v. Geernaert* (1988) 199 Cal.App.3d 1425, 1432 [245 Cal.Rptr. 712].) Property in receivership remains under the court's control and continuous supervision, and the importance of such supervision cannot be overstated. (*Stark, supra,* 131 Cal.App.4th at p. 204.)

 Generally, the functions and powers of a receiver are controlled by statute, by the order of appointment, and by the court's subsequent orders. (*Cal-American Income Property Fund VII v. Brown Development Corp.* (1982) 138 Cal.App.3d 268, 273 [187 Cal.Rptr. 703] (*Cal-American*); see generally 55 Cal.Jur.3d (2004) Receivers, § 55, p. 68, and cases cited.) As relevant here, section 17980.7 provides that, unless the court otherwise permits, the appointed receiver has the power and the duty to "take full and complete control of the substandard property" (*id.,* subd. (c)(4)(A)) and to take a number of actions, including managing the substandard building and paying taxes and expenses (*id.,* subd. (c)(4)(B)), dealing and contracting with a licensed contractor as necessary to correct the conditions cited in a notice of violation (*id.,* subd. (c)(4)(C), (D)), and collecting and using rents and income, or borrowing funds, to pay for the cost of necessary rehabilitation and repairs (*id.,* subd. (c)(4)(E), (F) & (G)). Section 17980.7 also empowers the receiver to sell the property or to take any other action respecting the property as the court may authorize. (*Id.,* subd. (c)(4)(H); Code Civ. Proc., §§ 568, 568.5.)[11] In its order appointing the receiver, the trial court specifically granted these powers, and additionally authorized the receiver to investigate and recommend the alternative of demolition if appropriate.

[11] Pursuant to section 17980.7, subdivision (c)(4)(H), the receiver may exercise the powers granted to receivers under Code of Civil Procedure section 568, which provides: "The receiver has, under the control of the Court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, *and generally to do such acts respecting the property as the Court may authorize.*" (Italics added.) Section 568.5 provides that a receiver may, pursuant to an order of the court and subject to court confirmation, sell real or personal property upon the notice and in the manner prescribed by law.

We have found no published California decision articulating a specific standard for reviewing a trial court's approval of a receiver's application to demolish a building. Typically, however, court rulings on receivership matters are afforded considerable deference on review. (E.g., *Lesser & Son, supra,* 35 Cal.2d at p. 503 [confirmation of receiver's sale of partnership assets and real property]; *Golden State Glass Corp. v. Superior Ct.* (1939) 13 Cal.2d 384, 393 [90 P.2d 75] [appointing or refusing to appoint a receiver]; *People v. Riverside University* (1973) 35 Cal.App.3d 572, 582 [111 Cal.Rptr. 68] [confirmation of receiver's sale of university furniture and equipment].) Such deference is the rule, even where the court confirms extraordinary action by the receiver, such as a sale of real property. (E.g., *Lesser & Son, supra,* 35 Cal.2d at p. 503; *Stark, supra,* 131 Cal.App.4th at pp. 199, 207–208 [dealership assets and real estate].) Because the highly deferential standard is appropriate for court decisions that are drastic enough to extinguish an owner's interest in property, we find it equally appropriate for decisions pertaining to the demolition of substandard structures that pose a substantial health and safety risk.

We therefore adopt the following standard for reviewing the trial court's decision here. The order authorizing the receiver to contract for demolition rests upon the court's "sound discretion exercised in view of all the surrounding facts and circumstances and in the interest of fairness, justice and the rights of the respective parties. [Citation.] The proper exercise of discretion requires the court to consider all material facts and evidence and to apply legal principles essential to an informed, intelligent, and just decision. [Citation.] Our view of the facts must be in the light most favorable to the order and we must refrain from exercising our judgment retrospectively." (*Cal-American, supra,* 138 Cal.App.3d at p. 274; see *People v. Riverside University, supra,* 35 Cal.App.3d at p. 582.) Where there is no evidence of fraud, unfairness, or oppression, the court has wide discretion in approving the receiver's proposed actions. (See *Lesser & Son, supra,* 35 Cal.2d at p. 503; *People v. Riverside University, supra,* 35 Cal.App.3d at p. 582.)

In the proceedings below, a majority of the Court of Appeal determined that, under the circumstances, the trial court did not abuse its discretion in approving the less expensive and more profitable demolition and sale of the property (which would leave equity of $455,000), over the more expensive and less profitable rehabilitation of the property (which would leave equity of $305,000). The dissenting justice, however, concluded it should be Gonzalez's decision as the owner to forgo the additional equity ($150,000) and to keep the property even though it would be less profitable.

Unlike the Court of Appeal, we do not view this case as presenting the question whether a trial court abuses its discretion when it fails to defer to the

owner's wishes as between two "profitable" options for dealing with substandard property. Rather, the issue is whether the trial court abused its discretion in authorizing the receiver to contract for demolition upon finding that the property was uninhabitable and that rehabilitation was "not economically feasible."

Here, the circumstances surrounding the receivership demonstrated the challenges both the receiver and the trial court faced in addressing the substandard and uninhabitable condition of Gonzalez's property. First, the trial court heard evidence of the property's deteriorating and dilapidated state. A number of serious building, fire, housing, plumbing, and electrical code violations existed on the property, including the accumulation of combustible debris and rubbish; the use of extension cords in place of permanent electrical wiring; the absence of heating and operable windows in the units; the failure to maintain the property in a safe and sanitary condition; and the maintaining of an attractive nuisance. Gonzales was renting out multiple beds on the second floor in violation of permissible occupancy rules. Moreover, the property attracted the criminal element, as exemplified by evidence of 32 calls to police between October 2003 and October 2004 reporting alleged criminal activity there.

Second, the receiver presented evidence that he had investigated two alternative solutions for the property: (1) repairing and rehabilitating the existing structure, and (2) demolishing it. The bids the receiver solicited for each alternative reflected that rehabilitation would cost approximately $145,000 and yield real property worth $450,000 (thus resulting in equity of approximately $305,000), while demolition would cost $54,000 and yield a lot worth $509,000 (resulting in equity of $455,000). Thus, a sale of the property would yield $59,000 more after demolition than after rehabilitation.

The receiver indicated, however, that the foregoing figures were not certain. Although the bid for correcting the known code violations amounted to $145,000, the receiver advised that, based on his experience as a receiver in prior similar cases, it was likely that rehabilitation costs would increase significantly as additional problems were discovered during progress of the work, and that consequently the costs of administering the receivership would also likely increase.[12] Based on these considerations, the receiver was not the only one in favor of demolition: Downey Savings, the lender and first priority lienholder, also expressed support for demolition.

Third, there was evidence the City had tried unsuccessfully for many, many years to compel Gonzalez to repair or abate the serious building, fire,

---

[12] A significantly higher cost figure would be more consistent with the City's estimate that it would cost at least $350,000 to bring the property into code compliance. (See *ante*, fn. 4.)

housing, plumbing, and electrical code violations that existed on his property. Despite a previous civil lawsuit that culminated in the City's demolition of a structure on the property, and despite two criminal prosecutions that resulted in various contempt orders and jailing for over nine months, Gonzalez was persistent in his refusal to rehabilitate the property.

Fourth, Gonzalez himself informed the court that he opposed demolition and that it was his "fervent wish" to be permitted to continue inhabiting the property with his family. As for his financial condition, Gonzalez was on record as representing that, apart from the rents received from the property, he was unemployed and had no other income or assets.

When we apply the highly deferential standard of review, and take into account all the surrounding facts and circumstances presented, we cannot conclude the trial court abused its discretion in authorizing the receiver to contract for demolition. The evidence presented to the court amply demonstrated that the known code violations were extensive and supported its determination that the property was uninhabitable. The circumstances brought to the court's attention also supported its conclusion that rehabilitation was not economically feasible. Although the information provided by the receiver indicated there was enough equity in the property to secure financing for the rehabilitation bid of $145,000, the court could reasonably agree with the receiver that the costs of both rehabilitation and receivership administration would likely increase significantly as additional problems surfaced during the course of the corrective work. Moreover, regardless of the equity available for securing financing, Gonzalez made no showing or contention that he could qualify for a loan to finance the necessary repairs or that he had the ability to repay such a loan were he to retain ownership and regain possession of the property. To the contrary, he represented he was unemployed and had no financial resources apart from the property (and its illegal rental units). Finally, there is nothing to suggest the court approved a fraudulent, unfair, or oppressive course of action. (See *Lesser & Son, supra,* 35 Cal.2d at p. 503; *People v. Riverside University, supra,* 35 Cal.App.3d at p. 582.) On this record, the trial court did not abuse its discretion in authorizing the receiver to contract for demolition of the unsafe and uninhabitable structure on the property.

Gonzalez contends owners have a statutory right under section 17980, subdivision (b)(1), to choose whether to repair or to demolish a building that is substandard or a nuisance. That provision does not aid him in this case because it is part of a different, albeit related, statutory scheme that authorizes enforcement agencies to take actions concerning substandard buildings without involvement of a receiver. In any event, in requiring that a property owner be given "the choice of repairing or demolishing," section 17980,

subdivision (b)(1), merely prohibits an enforcement agency from ordering an owner to demolish a substandard building without first affording the owner the choice and a reasonable opportunity to repair the building instead. (See, e.g., *Hawthorne Savings & Loan Assn. v. City of Signal Hill* (1993) 19 Cal.App.4th 148, 158–161 [23 Cal.Rptr.2d 272] [although city had engaged in unsuccessful efforts to get former owners to repair certain substandard buildings, city did not make such efforts with the new owner and simply served it with a notice and order to demolish the buildings within 120 days without allowing an opportunity to choose repair over demolition].)

While we do not intend to suggest that section 17980, subdivision (b)(1), applies here, this case does not involve a demolition that was ordered without an opportunity to repair. (E.g., *Hawthorne Savings & Loan Assn. v. City of Signal Hill, supra,* 19 Cal.App.4th 148.) Here, the trial court specifically found, in connection with its order appointing the receiver, that Gonzalez "has been afforded a reasonable opportunity to correct the conditions" cited in the City's May 21, 2002 Notice. The record fully supports this finding, which undermines any notion that the type of choice guaranteed in section 17980, subdivision (b)(1), was denied here.

With regard to Gonzalez's wish to repair the property and to continue living there with his family, we accept this was a legitimate factor for the trial court to consider. Nonetheless, we find this factor did not mandate judicial disapproval of the demolition alternative, especially in view of the economic information presented. Moreover, Gonzalez had a long and undisputed history of demonstrating he was unable or unwilling to maintain his property in a habitable condition, despite the various civil and criminal actions, contempt and probation violation hearings, and resulting jail terms. Thus, even if the property were rehabilitated and returned to Gonzalez's control, the uncontroverted facts presented an overwhelming inference that Gonzalez did not have the economic means and the moral resolve to function as a responsible property owner so as to avoid once again endangering the health and safety of his family, potential tenants, and neighbors.[13] Considering all these circumstances, we hold the court acted well within its broad discretion, and clearly in the interest of fairness, justice and the rights of the respective parties and the public, in authorizing the receiver's pursuit of the demolition alternative. (*Cal-American, supra,* 138 Cal.App.3d at p. 274.)

---

[13] In an urban area such as Santa Monica, "conditions in one building can and do affect the residents of the buildings next door." (*City and County of San Francisco v. Jen* (2005) 135 Cal.App.4th 305, 311 [37 Cal.Rptr.3d 454].)

DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.