Filed 12/24/20  City of Irvine v. Ganish CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE CITY OF IRVINE, | |
| Plaintiff and Respondent, | G057532 |
| v. | (Super. Ct. No. 30-2018-01006496) |
| HAYM GANISH, | O P I N I O N |
| Defendant and Appellant; | |
| MARK A. ADAMS, | |
| Real Party in Interest and Respondent. | |

Appeal from an order of the Superior Court of Orange County, James Di Cesare, Judge.  Affirmed.  Motion to dismiss denied.

John L. Dodd & Associates and John L. Dodd for Defendant and Appellant.

Rutan & Tucker and Noam Duzman for Plaintiff and Respondent City of Irvine.

California Receivership Group, Mark S. Adams, Andrew F. Adams, and Lyna S. Chon for Real Party in Interest Mark S. Adams.

\*     \*     \*

Haym Ganish appeals from an order which authorized a receiver, Mark S. Adams, to demolish his house because of its extensive history of unpermitted and unsafe renovations, and because the uninhabited property had become a nuisance. Ganish contends the order must be reversed because it was made without affording him due process, and because the property rehabilitation option considered by the court exceeded its jurisdiction in the receivership. Ganish suggests that if the court had properly understood the limitation on its power to rehabilitate the property, it would have been more likely to order that option.

Adams, the real party in interest, has moved to dismiss the appeal. Adams argues the appeal is both moot—since the house has now been demolished—and premature. With respect to the latter point, Adams contends that any complaints Ganish has about the demolition can be addressed and resolved in connection with the hearing to wind up the receivership and discharge him as receiver.

The motion to dismiss the appeal is denied. As Ganish points out (and Adams appears to acknowledge), if we were to conclude the property was demolished pursuant to an erroneous order, Ganish could be entitled to pursue other remedies based on the improper demolition. Consequently, this appeal is not moot.

And in arguing this appeal is premature, Adams does not deny the order is directly appealable. That being the case, the failure to appeal promptly, within the statutory deadline, would result in the order becoming final and binding. It could not thereafter be challenged. Thus, the pursuit of this appeal was necessary.

That having been said, we find no error in the trial court's decision, and affirm it on the merits. Ganish's due process argument had to be raised, if at all, in an appeal from the order appointing Adams as receiver. That order was dependent on a

2

finding, which the trial court made, that Ganish had been given sufficient notice of the property's code violations and had failed to correct them within a reasonable period. The court then also found that Ganish had been afforded due process. Ganish's failure to challenge those findings in a direct appeal from the receivership order waived the challenge.

Ganish's challenge to the scope of the court's contemplated rehabilitation plan is also unpersuasive. The receivership was based in part on the property's status as an attractive nuisance, which qualified as a Health and Safety code violation the city could move to abate. Consequently, within the context of the receivership, the court had authority to order whatever rehabilitation measures were reasonably calculated to abate that nuisance. And because the nuisance in this case was largely the product of the property's dilapidated and apparently abandoned state, the court did not err in concluding the property's rehabilitation would have to include both the completion of its decades-delayed remodeling plan, and the landscaping and other exterior upgrades necessary to dispel the impression that the property was abandoned.

**FACTS**

In July 2018, the City of Irvine petitioned for the appointment of a receiver over the Ganish residential property, which by then had for many years been the object of the City's attention. The evidence submitted in support of the petition demonstrated the property was encumbered with an "abandoned and uninhabitable" structure that was "three stories high, with over 8,000 square feet of unfinished interior space, interior roof access, areas of unstable floors and unprotected interior drops of up to 30 feet." The City further alleged "the numerous rooms and hallways make the abandoned Property particularly appealing to youth, and plainly constitutes an attractive nuisance. Using social media, minors document their trespasses onto the Property and inside the Property, which has become popularly known under several names, including the 'Haunted

3

Mansion;' the 'Abandoned Mansion;' the 'Irvine Doll House;' and the 'Haunted Doll House.'"

The City summarized the history of code violations, unfinished work and dangerous conditions on the property, dating back to 1982 when Ganish obtained a building permit to partially demolish and rebuild the structure. Around the same time, the City sent him a letter about a number of uncured code violations on the property.

Thereafter, Ganish sought and received several revisions to the original building permit, but never completed the work permitted by any of them. The City later discovered that Ganish and his family regularly resided at the property without obtaining a certificate of occupancy. Because Ganish failed to comply with the City's notices, the City filed a criminal complaint against him, alleging he was residing in a partially constructed and unsafe structure. Ganish thereafter pleaded guilty to four misdemeanor counts and was placed on probation.

The parties later agreed that Ganish could withdraw his plea, and the criminal case would be dismissed in exchange for Ganish's agreement that only one person could be inside the property at night, and his representation that the property would be brought into code compliance. Unfortunately, Ganish failed to comply with this agreement, and in 1986, the property was declared a public nuisance.

The City provided Ganish additional opportunities to bring the property into code compliance and make it habitable, to no avail. In 1994, the City's Building Official prepared a report declaring the property to be uninhabitable. The City then sought a demolition order.

In response, Ganish filed a lawsuit challenging the constitutionality of the City's nuisance regulations and enforcement actions. Ultimately, that lawsuit resolved with a stipulated judgment providing that Ganish would complete the construction and correct all code violations within specified time periods. If he failed to do that, the City

4

could proceed with demolition. Once again, Ganish failed to comply, and the City obtained a court order for demolition of the structure in 1995.

However, the City delayed demolition, instead entering into yet another agreement to allow Ganish to rehabilitate the property. Under that 1995 agreement, the parties agreed that Ganish would swiftly bring the property into minimum compliance sufficient to allow parts of the structure to be made habitable while additional work was completed. The initial minimum compliance work included installing proper utilities, ensuring that at least one bathroom was operational, bringing the electrical system into code compliance, replacing broken windows and sealing off "all 'openings,'" installing railings and support beams on all exterior landings and completing the driveway. The agreement required Ganish to commit $65,000 to the completion of that compliance work, and required that Ganish and his family live off-site while it was completed.

The 1995 agreement also prohibited Ganish from undertaking any additional work on the property without first obtaining a permit; it further indicated that any previously issued permits were null and void. It also specified that in the event Ganish undertook any additional work on the property prior to obtaining City approval, the City had the power to exercise all remedies including, in the City's sole discretion, the demolition of the structure.

The City thereafter issued a building permit for completion of the minimum compliance work; some of that work was completed. The City then issued a notice of completion which reflected certain "exceptions" to the completed work, and prohibited the occupation of several areas of the structure. But the 1995 permit expired before all work required was completed.

5

At some point, some of the approved work was torn out or replaced without permits.[1] Ganish ceased residing on the property, and in his absence, the unoccupied property became a target for vandals.

In February 2017, the City responded to reports of break-ins by contacting Ganish's son, who reluctantly agreed to secure the property "just the one time." Two days later, the City inspected the exterior of the property and documented evidence of "broken windows; exposed, deteriorated and unsightly building exteriors; accumulations of dead/overgrown vegetation; accumulations of stored, discarded or unused lumber, junk, trash and debris; and graffiti inscribed upon the Property."

The City was unable to locate Ganish and again contacted his son. The son reported he did not know where his father was or how to contact him.

Two and a half weeks after its initial inspection, the City again inspected the property and found it unsecured. Boards affixed to broken windows had been removed, additional windows had been broken, and additional graffiti had been added. Other evidence of neglect and decay, including mold, was also observed.

In March 2017, the City's inspection revealed the property had been secured, but was not otherwise rehabilitated. A subsequent inspection in May 2017 revealed the property was once again unsecured and open to unauthorized entry.

The City issued a "Pre-Citation Correction Notice" to Ganish in June 2017, and secured an inspection warrant to enter the property in July 2017. That interior inspection revealed a number of substandard conditions, including the lack of hot and cold running water, the lack of proper plumbing facilities, vermin infestation, water

---

[1] Among other things, the City documented evidence of (1) unpermitted plumbing, framing and electrical work in several bathrooms, (2) unpermitted plumbing, framing and drywall installed in the attic, which cannot be used for habitation, (3) an unpermitted spiral staircase to the attic, (4) an unpermitted and unsafe balcony extension, (5) an unpermitted and unsafe staircase from the second floor, and (6) an unpermitted water heater.

6

intrusion, mold growth, rotted and buckling roof coverings, and accumulations of trash and debris.

Based on the July 2017 inspection, the City "red-tagged" the property, meaning it declared the property unsafe for occupation, and caused the gas and electrical utilities to be shut off.  Following the red-tagging, the City's code enforcement log for the property reflected that Ganish entered the property several times with contractors or workers—sometimes with the City's permission, and other times without it.

On August 3, 2017, in anticipation of filing the receivership action, the City issued Ganish a "Final Notice" that was posted on the property and served on him by first class mail.  The notice listed a number of nuisance conditions and code violations observed on the property.  It instructed Ganish that he must contact the City no later than August 10 with a written and detailed timeline for correcting the noted violations, adding his failure to do so would leave the City with no option but to seek the appointment of a receiver to take control of the property.

In the wake of the final notice, Ganish and his counsel met with representatives from the City, and they were told that Ganish would be required to complete construction of the structure and bring the property into full compliance with all code provisions.  Following that meeting, Ganish's son contacted counsel for the City, offering to act as a point of contact for resolving the enforcement action.

However, after significant negotiations between the City and Ganish's son, and later Ganish himself, Ganish refused to agree to the resolution proposed by the City.  Instead, Ganish took the position that the 1995 agreement had given him the right to maintain the structure in violation of the City's regulations.

Ganish thereafter again failed to take corrective action and, on July 18, 2018—nearly a year after the final notice was served—the City filed its receivership petition.  In the petition, the City again described a number of  violations observed at the Property, including that (1) the property constituted an "attractive nuisance which may

prove detrimental to children"; (2) the property constituted a "public nuisance" because it was unkempt, unsightly and cluttered with debris; (3) the property was in violation of the Health and Safety Code because it had inadequate sanitation, visible mold growth, general dilapidation, and structural hazards that included deteriorated flooring or floor supports, faulty weatherproofing and resulting rotted, split or buckled exterior wall and roof coverings, and had substantial accumulated vegetation, debris, stagnant water, combustible materials, and similar materials or conditions constituting fire, health or safety hazards; and (4) the property "also encroaches into the right-of-way and exceeds the maximum building height limit."

In August 2018, the court continued the hearing date on the receivership motion to September 2018. In his opposition, Ganish argued that the receivership petition "arises from the City's latest attempt to demolish the property." He argued the City's complaints about the property were conclusory and unsubstantiated, that he had been denied access to the property to determine the "extent and veracity of the City's claims," and that it was the City's decision to red-tag the property that had "served as a beacon to the local youth that the property was uninhabited, and as youths do, the property was used for mischief."

In October, Ganish moved ex parte for a site inspection, arguing again that the City had denied him access to the property to conduct his own inspection, and that if he were denied that opportunity, it would severely prejudice his ability to respond to the petition. On October 4, 2018, the court denied Ganish's motion.

On October 12, the court granted the receivership petition and appointed Adams as the receiver for the property. The court found that Ganish "has been provided with notices to repair and abate the nuisance conditions, and has not done so within a reasonable time." The court also found that Ganish "has been afforded his procedural due process rights guaranteed by the California Constitution and the United States Constitution, including, but not limited to, receipt of the notices of violation and an

8

adequate and reasonable period of time to comply with the notices and orders issued by the City, as well as notice and reasonable opportunity to be heard in connection with the City's petition." The court grounded the appointment on "Code of Civil Procedure section 568 and Health and Safety Code section 17980.7(c)(4)(H) [which] empower the appointed Receiver generally to do such acts respecting the Subject Property as this Court may authorize."[2]

The court empowered Adams to "take full and complete control of the Subject Property," and directed that the property remain vacant if deemed necessary by Adams. Adams was also ordered "[t]o secure a cost estimate and construction plan from a licensed contractor for the repairs necessary to correct the offending conditions set forth in the City's notices of violation," and to "enter into contracts and employ a licensed contractor as necessary" for that purpose.

The court also ordered Adams to "arrange for an inspection of the premises by [Ganish]'s experts and to coordinate with [Ganish] in considering bids for any remedial work." Ganish was ordered to "[c]ooperate with the Receiver in his management and rehabilitation of the Subject Property."

The court scheduled a status conference for November 13, 2018. On November 9, Adams filed a short first report, informing the court that he had been working cooperatively with Ganish's counsel, who had arranged for a team of experts to walk the site with Adams on November 1. Adams stated he had anticipated presenting either a joint recommendation or a coordinated one with Ganish's counsel at the status conference; however, he had just learned that Ganish terminated his counsel. Consequently, Adams requested a brief continuance of the status conference to formulate his recommendation.

---

[2] All further statutory references are to the Health and Safety Code, unless otherwise indicated.

9

On November 27, 2018, Adams filed his second report, informing the court that when he first inspected the property on October 17, he found it be uninhabited and unsecured, with significant evidence of "trespass and vagrancy" on the premises, including "empty alcohol bottles, graffiti, and trash throughout the Property." He also stated that in his experience, "it was immediately apparent to me that the Property was structurally unsound based on the evident signs of haphazard and unprofessional construction work throughout." (Footnotes omitted.)

Adams stated he inspected the property again on October 26 with representatives from the City, and again on November 1 with Ganish, Ganish's (since terminated) counsel, and Ganish's team of experts (including his since-terminated architect.) According to Adams, Ganish's team agreed it was unlikely that anything in the structure could be salvaged, and that the first step should be stripping the walls to assess the soundness of the structure.

Adams reported that a full remediation of the building would require "substantial seismic retrofit and extensive structural repairs, for which new plans would need to be drawn up in order to meet current code requirements." He estimated making the building safe "could easily cost in the neighborhood of $700,000." He explained that the need for such extensive repairs stemmed from Ganish's "haphazard modifications to the Property since 1995."

Adams informed the court that although his standard practice was to perform a full rehabilitation of a property whenever possible, his initial recommendation in this case was to demolish the structure and sell the land. The estimated cost of such a demolition was $59,000, while it would likely cost $100,000 just to do the more targeted demolition discussed with Ganish and his team, to evaluate whether the structure could be saved. Adams explained that the estimated price of a rehabilitation would include the $100,000 in exploratory demolition, plus $700,000 to $800,000 in repairs to bring the structure up to code, which was "well beyond what I would be able to finance—in fact,

10

the upper end of that estimated range exceeds a broker's price opinion on the Property's value if fully repaired."

On January 4, 2019, Ganish filed a report prepared by a civil engineer, which set forth "what improvements to the structure are required to keep it safe until the disposition of the property has been determined." The document acknowledged that the investigation was limited because the walls were covered by siding, cladding and drywall. It recommended the addition of two shear walls on the first floor and in the attic and some upgrades to the other first and second floor shear walls. It also identified moisture intrusion issues, and recommended remediation, identification of the leaks, and waterproofing. The report also recommended the power not be turned on until after a safety check of the electrical system, noting there had likely been rodent damage.

On January 18, 2019, Adams submitted his third report. In that report he acknowledged receipt of the civil engineering report produced at Ganish's behest, which he described as a "competent evaluation of the structural work required to make the building habitable," but which "does not contain any reference to the work needed to remediate all the other health and safety violations at the site." Among the deficiencies Adams identified in the engineer's report was that it failed to address the fact that the structure violated setback requirements on the north and southwest borders, which would require the drafting of new construction plans and additional structural work not addressed in the report.

According to the licensed contractor Adams consulted, it would cost an estimated $233,000 to permanently address the necessary structural repairs outlined in the report produced by Ganish's civil engineer.

The contractor also estimated it would cost no less than $1 million to do the bare-bones version of a rehabilitation of the property, and up to more than $2.2 million to rehabilitate the property completely "with higher-end accoutrements consistent with the intended aesthetic of the Property." However, based on a broker's estimate, the property

11

would have a market value of only $800,000 if fully repaired. Thus, unless Ganish showed proof of funds to pay the estimated cost of a rehabilitation, it remained Adams's recommendation to demolish the structure.

On January 30, the court held a status conference, at which the parties discussed their divergent views of the work necessary to make the property safe. Ganish argued that his civil engineer's report sufficiently documented the work necessary to make the property temporarily safe, while Adams and the City argued that the relevant issue was the scope of structural work necessary to permanently rehabilitate the property.

Ganish argued that the goal of the receivership should be to make the property safe. The court disagreed and said "the structure should be finished in some manner." The court then proposed an immediate site visit; the court and the parties reconvened at the property to inspect it.

At the conclusion of the hearing, the court ordered the status conference continued to February 5 to give Ganish the opportunity to file any additional documents to support his vision for rehabilitating the property. The court also informed the attorney who had been specially appearing on Ganish's behalf that he would have to formally substitute in if he wished to continue representing Ganish.

On January 31, Ganish's attorney formally substituted into the case. Ganish also filed a document entitled "supplement to civil engineering report," in which he claimed that his civil engineer had identified "the materials needed to complete the work identified in his January 4, 2019, report," and that the total cost of those materials at Home Depot was less than $3,000. The list of materials, reflecting a very temporary approach to the structural repair, included "holdowns," "clips," and "plywood"— presumably for the shear walls—plus 5,000 feet of "tarp" for the roof, 1125 feet of "cover" to protect windows, and "straps and blocking around window."

Ganish's filing also asked the court for access to the property to have "his contractor" determine the cost of completing the repairs necessary to make the property

12

safe. He informed the court that his son was a licensed contractor and that he was "cautiously hopeful" his son would agree to help. Otherwise, Ganish represented that he had located an additional contractor who was willing to bid the job, but would need access to the property.

At the February 5 hearing, Ganish asserted that the property could be rehabilitated at a significantly lower cost than the receiver had estimated, and argued that any rehabilitation should be confined to structural safety issues, and not extend to the installation of cabinets, carpets and other finishings in the property.

Adams and the City disagreed, pointing out that the receivership was necessitated by Ganish's decades-long history of code violations and unfinished work, and that if the structure were not demolished, the house must finally be completed. They also argued that given the extensive and overlapping code violations, it was neither possible nor sensible to separate the work into structural and non-structural elements.

The court agreed with the receiver, stating it wanted the property made safe and completed. However, given the ongoing dispute about the property's potential for rehabilitation, the court gave Ganish one more opportunity to offer evidence and arguments in support of his vision and set the matter for a further hearing on March 22. The court explained that the papers already filed by the City would be treated as the moving papers in support of a demolition order.

The court directed the parties to be prepared to address (1) the extent and cost of the work required to rehabilitate the property, including the work required to correct the structure's violation of height limitations; and (2) the salvage value of the structure, if it were demolished. The court also asked the parties to obtain a joint appraisal of the land value and ordered Ganish to provide proof of funds to show he had the means to rehabilitate the property.

The court also advised Ganish that he should "present a line item construction bid to fully remediate all code violations (including, but not limited to,

13

structural issues), if at all, by February 21, 2019. That bid must include installation of all components that would be expected in a standard residential property including cabinetry, counters and the like." Ganish was also to provide proof that he had the funds to pay for the rehabilitation of the property by that same date.

Three days after the February 5 hearing, Ganish again filed a substitution of attorney, substituting himself in propria persona.

On February 15, the City filed a supplemental brief advocating for demolition of the property, along with a declaration of its counsel, once again outlining the property's history of code violations and unfinished work.

Adams filed his sixth report on that same date, again explaining his support for demolition of the property. In accordance with the court's order, Adams reported that he obtained an appraisal of the land value, without any improvements in the amount of $450,000, which was enough to cover the cost of demolition.

Adams also explained why it would be impractical to try to fix each individual structural code violation, without engaging in a comprehensive rehabilitation of the structure.[3] He emphasized that Ganish had yet to provide any evidence of how he would rehabilitate the property, or to demonstrate that he had the financial means to do so.

---

[3] As an example, Adams pointed to the height violation of the roofline, which included unpermitted spires: "The City has informed the Receiver that the City's height limit is 35 feet, and the spires on the structure exceed that height and so would have to be cut down or removed somehow. However, to cure this violation is not simply a matter of cutting off the tips of the spires; after the spires are cut down, the roof must then be patched up somehow, but that would result in the intractable situation of having to re-roof a cone with the tip cut off. Given the unique structure of the roof, it will take extensive reconstructing to build a roof that is functional and aesthetically acceptable. We would have to design an entirely new roof line, which sits on top of a third-floor footprint that is teetering over the floors below. That means a whole new set of load calculations and framing work."

14

Ganish failed to file any opposition evidence or briefing on the demolition motion by the court's February 21 deadline. Instead, on March 21—one day before the hearing—Ganish's most recent former counsel filed a declaration purporting to summarize a factual history of the receivership and what he claimed was the City's refusal to allow Ganish access to the property. The declaration did not establish counsel had personal knowledge of the events alleged.

Ganish appeared at the March 22 hearing. He was accompanied by his most recent former counsel, who stated he was present to support Ganish as his friend. Ganish argued that he had not been given sufficient specific information about the violations to develop a plan for addressing them. He presented the court with evidence including an August 2017 e-mail from his then-attorney to a representative of the City, complaining that the red-tag notice "does not describe [with] reasonable particularity . . . the alleged conditions," and stating the then-attorney and Ganish were enroute to the property to document its condition.

Ganish also presented the court with an estimate from Builders Surplus, reflecting that cabinets for the house could be purchased for significantly less than the price estimated by the contractor Adams consulted, as well as a copy of a Zillow "Zestimate" valuing the property at over $3.5 million. Ganish represented to the court that he needed six months to complete the necessary work on the structure; he did not present any detailed plan or description of that work. He also made no representations about his ability to pay for the necessary work to rehabilitate the property.[4]

---

[4] Ganish claims he made a showing he had $200,000 to pay for necessary rehabilitation. Ganish's specific contention is that he represented to the court in October 2018—prior to the order appointing Adams as receiver—that he had "close to $200,000" in the bank that he could use to repair the property himself. That representation failed to establish Ganish's ability to pay for the rehabilitation contemplated by the court in March 2019.

The court declined Ganish's request for additional time, noting that the City had allowed him over 30 years to complete the construction on his house, yet the work had never been completed. The court also observed it had continued the hearing to give Ganish time to present evidence demonstrating that the structure could be rehabilitated and that he had the means to pay for it. He did neither. Consequently, the court concluded that demolition of the property was appropriate.

On March 28, 2019, Ganish filed his notice of appeal.

## DISCUSSION

1. *Motion to Dismiss*

Adams filed a motion to dismiss the appeal, arguing that the appeal is simultaneously moot and premature. He asserts it is moot because the house was demolished while the appeal was pending.[5] It is premature because any claim for monetary damages based on the demolition must be presented at the hearing on Adams's discharge as receiver. We reject both assertions, which we find inherently inconsistent.

We start with the fact that the order qualifies as an injunction, which is directly appealable pursuant to Code of Civil Procedure section 904.1, subdivision (a)(6). (*Stewart v. Superior Court of San Diego County* (1893) 100 Cal. 543, 545 [affirmative injunction is one that "commands or permits some act to be done"].) Adams does not contend otherwise.

Because the order is directly appealable, it must be appealed promptly, within the jurisdictional time frame, or the right to do so is forfeited and the order becomes immune from direct challenge. "California follows a 'one shot' rule under

---

[5] Adams assumes it was proper for the demolition to proceed, despite the pendency of this appeal, because Ganish did not seek a stay of the demolition order. Ganish, on the other hand, offers a detailed argument explaining why the demolition order was automatically stayed during the pendency of the appeal. We need not resolve the point.

which, if an order is appealable, appeal must be taken or the right to appellate review is forfeited. (See [Code Civ. Proc.,] § 906 [the powers of a reviewing court do not include the power to 'review any decision or order from which an appeal might have been taken' but was not].” (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 761, fn. 8.) Thus, this appeal is not premature.

Adams's prematurity argument explains why this appeal is not moot. The pivotal question in determining if a case is moot is whether the court can grant the plaintiff any effectual relief. (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 227.) According to Adams, any potential claim for monetary damages against him arising out of the demolition would have to be presented in connection with Adams's discharge as receiver.[6] But the success of such a claim would hinge on a determination that the demolition order was improper—the exact issue to be determined in this appeal.

Thus, although our reversal of the demolition order could not restore the property, it could provide Ganish with the basis for an alternative claim for damages. The appeal is consequently not moot.

2.    *Denial of Due Process*

Ganish first argues the court erred because it denied him due process before ordering his property demolished. Ganish relies on *Hawthorne Savings & Loan Assn. v. City of Signal Hill* (1993) 19 Cal.App.4th 148, 159 (*Hawthorne Savings*), for the proposition that “'[A] municipality must, before destroying a building, give the owner sufficient notice, a hearing and ample opportunity to demolish the building himself or to do what suffices to make it safe or healthy; such a procedure is the essence of the

---

[6]    Additionally, as Ganish points out in his opposition to the motion, a determination of wrongful demolition might also be relied upon as the basis for a damage claim against the City, the party which sought the demolition. To the extent that such a claim could be brought, it would not be done within the confines of the receiver's discharge proceeding.

17

governmental responsibility to accord due process of law.'" (See also *D & M Financial Corp. v. City of Long Beach* (2006) 136 Cal.App.4th 165, 174 ["[w]hen a city threatens to demolish structures, due process requires that the city provide the property owner and other interested parties with notice, with the opportunity to be heard, and with the opportunity to correct or repair the defect before demolition"].) Indeed, Ganish claims that *Hawthorne Savings* establishes his "constitutional right to choose repair or demolition." (Citing *Hawthorne Savings, supra*, at p. 159.)

According to Ganish, his right to repair the property required that before demolition could be ordered, the City was obligated to provide him with "meaningful access to the property" and a "specific 'punch list' detailing the items requiring repair" so that he could gather the evidence "necessary to present a more extensive renovation plan to the court." While that argument is correct in some respects, it is misplaced here.

Ganish's right to be notified of the code violations on the property, and to pursue repair, existed *before* the court appointed Adams to act as receiver pursuant to section 17980.7, subdivision (c)(1). *Hawthorne Savings* did not involve a property that had been placed in receivership pursuant to that statute.

The court's authority to appoint a receiver pursuant to section 17980.7 is dependent upon its determination that the property owner has "fail[ed] to comply within a reasonable time with the terms of the order or notice [to repair] issued pursuant to Section 17980.6."[7] (§ 17980.7.) As explained by our Supreme Court in *City of Santa Monica v.*

---

[7]    Section 17980.6 states in pertinent part that "If any building is maintained in a manner that violates any provisions of this part, the building standards published in the State Building Standards Code relating to the provisions of this part, any other rule or regulation adopted pursuant to the provisions of this part, or any provision in a local ordinance that is similar to a provision in this part, and the violations are so extensive and of such a nature that the health and safety of residents or the public is substantially endangered, the enforcement agency may issue an order or notice to repair or abate pursuant to this part."

*Gonzalez* (2008) 43 Cal.4th 905, 920-921 (*City of Santa Monica*), "section 17980.7 contemplates that two different types of notice must be given to the property owner before a receiver may be appointed. The first type of notice . . . refers to the enforcement agency's notice to repair [and] makes clear that if the owner fails to comply with the notice to repair within a reasonable time, an enforcement agency, a tenant, or a tenant association or organization may seek an order from the trial court appointing a receiver."

When the court appointed Adams to act as receiver, over Ganish's objection, it made specific findings that Ganish "has been provided with notices to repair and abate the nuisance conditions, and has not done so within a reasonable time." The court also found that Ganish "has been afforded his procedural due process rights guaranteed by the California Constitution and the United States Constitution, including, but not limited to, receipt of the notices of violation and an adequate and reasonable period of time to comply with the notices and orders issued by the City, as well as notice and reasonable opportunity to be heard in connection with the City's petition."

The court's order appointing Adams as receiver was directly appealable. (Code Civ. Proc., § 904.1, subd. (a)(7).) Consequently, an appeal from that order would have provided Ganish the opportunity to challenge the court's findings. (*City of Santa Monica, supra*, 43 Cal.4th at p. 926 ["There is . . . no question an owner may contest a section 17980.7 receivership if fair notice of a claimed substandard condition was lacking or if a reasonable opportunity to correct the cited condition was not afforded"].) Ganish's failure to pursue such an appeal operated as a waiver of any challenge to the court's findings in support of the order.

The court's receivership order was also consequential in other ways that Ganish fails to recognize. Once the court appointed Adams to act as receiver, the property was removed from Ganish's control and placed "under the court's control and continuous supervision." (*City of Santa Monica, supra*, 43 Cal.4th at p. 930.) Adams's role as receiver was to act as "an agent and officer of the appointing court." (*Ibid.*)

19

Hence, it was the court, not Ganish, that had the power to decide whether the property should be demolished or rehabilitated, and the court—through its agent, Adams—that would carry out whichever option it chose. Ganish lost his right to control the property's fate when the receivership was established.

Of course, Ganish was still entitled to notice and an opportunity to be heard concerning which disposition of the property was more appropriate, demolition or rehabilitation, and to offer whatever arguments or evidence he could muster to persuade the court to adopt the option he favored. He was not, however, entitled to delay the process by insisting he had not been given sufficient notice of the property's problems.

Ultimately, the court made clear to Ganish that if he wanted to rehabilitate the dilapidated property, he was required to present the court with proof of his ability to pay for the necessary work. Given his failure to comply, there was insufficient evidence to demonstrate that rehabilitation was a viable option.[8]

3.      *Whether Rehabilitation Plan Exceeded Scope of Receivership*

Ganish also argues the court erred by adopting the receiver's recommendation that a rehabilitation of the property would have to incorporate a complete remodel of the structure, including cabinetry, carpeting and other finishes. Although Ganish acknowledges that "[w]here there is no evidence of fraud, unfairness, or oppression, the court has wide discretion in approving the receiver's proposed actions," (*City of Santa Monica, supra*, 43 Cal.4th at p. 931), he nonetheless contends that because the receivership was sought pursuant to a statutory scheme intended to address "Health and Safety Code violations," the court exceeded its jurisdiction by contemplating a rehabilitation project which incorporated what he considers to be purely aesthetic "remodeling" elements.

---

[8]      As we noted, Ganish's assertion that he had $200,000 "ready to invest in the project" was unsupported by the record. He made no such showing in connection with the motion for a demolition order.

20

Although the court did not actually order such a rehabilitation, Ganish contends the alleged error was prejudicial because if the court had understood that its rehabilitation options were limited to addressing specific tangible safety violations—it is reasonably probable the court would have elected a more modest rehabilitation.

We disagree. As we have already pointed out, Ganish failed to comply with the court's order that he prove he had the funds necessary to pay for a rehabilitation of the property. Consequently, the only evidence before the court when it ordered demolition was Adams's representation that the property's value would not enable him to obtain sufficient financing for even a basic rehabilitation of the dilapidated structure.

Based on that record, which is unrelated to whether the rehabilitation would be completed in accordance with Ganish's minimalist vision or Adams's maximalist one, the court would have abused its discretion by ordering rehabilitation. Absent evidence demonstrating exactly how much Ganish's contemplated rehabilitation would cost, and that he had the resources to fund that cost, we cannot conclude there was any reasonable probability that the court would have ordered it.

In any event, we also reject Ganish's argument that the court's contemplated rehabilitation exceeded the scope of its authority in the receivership. The problems with Ganish's property were not limited to discrete code violations in areas such as structural safety, plumbing, wiring and waterproofing. Rather, one of the biggest problems was the fact that the unfinished and dilapidated property had become a nuisance, attracting vagrants, vandals, and local teenagers who gathered there at night. That situation presented a health and safety risk not only to those who gathered, but also to the neighbors, given the risk of fire. Ganish was explicitly notified of the property's nuisance condition in both the pre-citation correction notice and the final notice. The need to abate the nuisance was clearly a key basis for appointment of the receiver.

Because a property's nuisance status is one of the conditions for determining it to be a "substandard building" pursuant to section 17920.3 (see § 17920.3,

21

subd. (c)), that condition does fall within the proper scope of issues to be abated in a receivership ordered pursuant to section 17980.7. (See § 17980.6 [establishing a city's authority to seek repair or abatement of any condition "that violates any provision of this part"].) We therefore conclude the court's authority in this receivership extended to ordering whatever remediation would be appropriate to abate the property's nuisance condition; it was not limited to addressing other discrete and tangible code violations. Given that the property had become an attractive nuisance as a consequence of having been maintained in an unfinished and uninhabited condition for years, it was reasonable for the court to conclude that the nuisance could not be satisfactorily abated as long as the structure continued to be maintained in essentially that same state.

We conclude that a contemplated rehabilitation of Ganish's property, which required the decades-delayed renovation to be completed once and for all, with any lingering impression of abandonment finally dispelled, was a reasonable approach to abating the nuisance. There was no error.

## DISPOSITION

The order is affirmed. The parties are to bear their own costs on appeal.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

22