Filed 7/20/22  P. v. Hoffman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> DAVID L. HOFFMAN, Individually and as Trustee, etc. <br><br> Defendants and Appellants. | A163281 <br><br> (Marin County Super. Ct. No. CV-15-02647) |

This appeal is from an order in a receivership matter initiated by respondents the People of the State of California and the County of Marin, Community Development Agency (collectively, the County) with respect to certain real property (the properties) owned by Hoffman.[1]  In October 2015, the court appointed a receiver pursuant to Health and Safety Code section 17980.7 and Code of Civil Procedure[2] section 568 to abate nuisances and

_____

[1] The properties are owned by the David L. Hoffman Revocable Trust dated December 20, 2002, for which David L. Hoffman is the trustee.  The notice of appeal in this matter was filed by Mr. Hoffman, both individually and as trustee of the Hoffman trust.  When we refer to Hoffman, we are referring to Mr. Hoffman individually, in his role as trustee, and/or to the Hoffman Trust, as the context requires.

[2] All statutory references are to the Code of Civil Procedure unless otherwise specified.

oversee remediation, after finding that the violations on the properties were "so extensive and of such a nature that the health and safety of the occupants, neighboring residents, and the general public [was] substantially endangered." After years of receivership proceedings, the superior court issued an order in May 2021 instructing the receiver "to retain a real estate broker to assess, value, list[,] and market" the properties for potential sale. Hoffman, who had been permitted to retain limited use of the properties during the pendency of the proceedings, was ordered to vacate the properties within 90 days.

After Hoffman appealed, the County moved to dismiss, arguing that the interim receivership order was not appealable under the collateral order doctrine. We agreed and dismissed the appeal. Thereafter, in February 2022, the Supreme Court granted review in the case, directed us to vacate our dismissal order, and asked us to "show cause" why the order at issue was not appealable as a collateral order. Having reconsidered the matter as instructed, we again dismiss the appeal.

## I.
## BACKGROUND

The two properties at issue in these receivership proceedings—the Cintura property and the Alta property—are owned by Hoffman and lie adjacent to each other in the County of Marin. Hoffman purchased the 1.66-acre Cintura property in 1973 and, we are told, still resides there pending the disposition of this appeal. A 1,368 square foot dwelling unit was built on the Cintura property in 1916. The last building permit for the property was issued in 1947 for repairs to that structure. Hoffman owned the Alta property with Susan Shannon until November 2002, when he became its sole owner. The Alta property is approximately 19,500 square feet. An 800

2

square foot dwelling unit was built on the Alta property in 1910. The only permit for the Alta property was issued in May 1994 for an electrical service change. The history of multiple code violations and substandard, hazardous conditions on the properties spans over 30 years.

## A. *The Cintura Property*

Starting in 1988, the County received a series of complaints regarding unpermitted construction on the Cintura property. The first stop work order issued in September 1988 and involved the construction of an unpermitted tea pagoda attached to the residence. In a February 1991 letter from the County, Hoffman was granted an extension to submit a permit application for the tea pagoda, but nothing was done to correct the violation. Another notice of violation issued in December 1999, ordering Hoffman to stop all work on a new unpermitted " 'dome type structure' " on the property for use as a tea cave. A September 2000 notice of violation ordered Hoffman to stop work on certain concrete construction, excavation, and ongoing work.

During a May 2001 site inspection, staff observed an unpermitted addition to the house that had been constructed under the deck and from which Hoffman was operating a tea business. The garage had been converted into a room to store tea. A detached structure, called the tearoom, had been built. Near the tearoom, a water storage pond had been fashioned, with adjacent outdoor bathing facilities. The tea pagoda was two stories, but still incomplete. An outdoor kitchen area with an open fire pit was observed on the property near construction for an outdoor shower tower. Across from the shower tower, an outdoor bathroom area with a composting toilet and urinal was being created. A wastewater pond system had been developed near the tea pagoda and the residence. The tea cave was still in existence. Up a pathway, a detached bedroom containing a propane heater was being

constructed.  Four trailers were also located on the property.  Although they appeared to be occupied, they had no sewer connections.

County staff met with Hoffman during a site inspection in January 2007 to discuss bringing the property into compliance.  He was given 30 days to take steps towards compliance, but, at a site inspection in February 2007, it was noted instead that another building had been constructed adjacent to the garage and more work had been done on the tea pagoda.  In November 2009, a notice of violation was issued for construction of a new unpermitted retaining wall on the northeast side of the property.

Furthermore, Hoffman was operating a commercial tea business from the Cintura property throughout this period.  The initial business, Silk Road Teas, was sold in 2004.  The new business, The Phoenix Collection, was not open to the public.  To support his commercial tea business, Hoffman stored large boxes of tea in various structures on the property and had employed at least one employee from time to time.  Nevertheless, no use permits were ever issued for the property.

During a February 2007 site inspection by County environmental health staff, Hoffman admitted that he had disconnected the primary residence from the septic tank and that he was constructing outdoor composting toilets, an open urinal, and an outdoor shower/bathing area which were not connected to the septic system.  In addition, neither the trailers on the property nor the many detached unpermitted structures constructed by Hoffman were plumbed into the septic system.  Instead, Hoffman had constructed unpermitted holding ponds on the property for residential waste and grey water.  Such above-ground sewage and wastewater holding ponds create both environmental and public health hazards.  A February 2007 enforcement letter from the County advised

4

Hoffman of the numerous code violations pertaining to his sewage disposal system and set forth specific timeframes for correction. As of an August 2011 site inspection, however, no governmental permitting had been obtained.

Regarding water issues, after a number of site inspections at the Cintura property, a civil engineer for the County determined that there is a natural watercourse that enters the property and that Hoffman had built unpermitted structures—including retaining walls, a boat pond, and a storage building—within 20 feet of the natural watercourse which altered and/or interfered with its flow. There were also concerns that the open black water and gray water holding ponds could overflow in a significant storm, introducing contaminated water into the natural aquatic system. In addition, the County determined that Hoffman had constructed and was operating an unpermitted well in the boat pond.

Hoffman was notified by the County in March 2010, June 2010, and June 2011, regarding the numerous code violations on the Cintura property. Each time he was given a detailed list of the necessary corrective steps and 10 days to arrange for correction of the violations. None of the violations were ever corrected, however. Instead, after a site inspection in October 2011, a notice of violation was issued for construction of a retaining wall near the tea storage structure as well as additional work on the previously identified projects. A senior code enforcement specialist for the County sent an enforcement letter to Hoffman that same month, characterizing the building code violations on the property as "significant" and suggesting he "contact a professional, such as an architect or engineer" to review the unpermitted structures and help him "prioritize what structures [to] pursue for legalization and what structures cannot be legalized and may need to be removed."

## B.    *The Alta Property*

In December 1998, the County received a complaint from co-owner Susan Shannon that Hoffman was constructing an unpermitted retaining wall out of wooden tea boxes on the Alta property.  In January 1999, an inspector observed the 30-foot retaining wall, which was six to eight feet tall and made out of tea boxes filled with unreinforced concrete.  A notice of violation was posted on the property for the illegal construction.  In response, Hoffman inquired about obtaining a permit for the wall and was told several times of the need to submit plans and obtain a permit or remove the wall.  In May 2000, Hoffman submitted a letter from a civil engineer opining that the retaining wall was " 'sound.' "  Staff explained the requirements for obtaining a building permit, and Hoffman responded he was having financial difficulties with complying but was attempting to work with the engineer to obtain the permit.  At a site inspection in May 2001, the retaining wall was observed to have been lowered and lengthened, but still required a building permit.  Over the years, staff continued to have discussions with Hoffman about bringing the retaining wall into compliance.

An inspection of the Alta property in December 2006 disclosed numerous unpermitted construction projects at various stages of completion similar to those described with respect to the Cintura property, including remodeling of the dwelling unit; conversion of the understory into a tea storage space; construction of additional retaining walls and detached accessory structures; and stonework related to a sewage treatment unit.  Despite posting a notice of violation ordering the stoppage of all work, a February 2007 inspection established that the unpermitted projects remained on the property and identified additional unpermitted construction.  For example, the dwelling unit had been substantially remodeled, including the

6

removal of the kitchen and bathroom, and there was no plumbing connection to septic or water.  In addition, a tea storage building with large wooden doors, two equipment storage buildings, and three concrete-block retaining walls had been constructed on the property.  Two additional mortared stone retaining walls had been built to create terraces for agriculture.  A follow-up letter was sent to Hoffman regarding the need to correct the violations and/or obtain building permits for the unpermitted structures.  Moreover, zoning issues existed with respect to use of the Alta property to store tea for Hoffman's commercial tea business.

Also in February 2007, an inspection by County environmental health staff disclosed that Hoffman was in the process of constructing a sewage and wastewater holding pond system on the Alta property without governmental approval.  The holding pond system was located in the vicinity of a natural watercourse which drained into Cintura Creek and San Geronimo Creek.[3] Hoffman was sent a letter setting forth the numerous violations on the property, with specific, phased timeframes for their correction.  At a meeting in March 2007, Hoffman was given instructions for obtaining a permit from the State Regional Water Quality Control Board for his above-ground sewage disposal system.  As of October 2007, no changes or corrections had been made, and Hoffman admitted he had dug a well on the property.  Over the next four years, despite continued reminders, Hoffman failed to seek permits for his waste disposal system.

---

[3] As with the Cintura property, Hoffman had built unpermitted structures within 20 feet of the natural watercourse which altered and/or interfered with its flow.  Thus, similar issues regarding interference and possible contamination of the watercourse were also present and unaddressed on the Alta property.

7

Inspections in August and October 2011 identified additional unpermitted construction, including an unreinforced masonry tower built over the unpermitted sewage and wastewater holding ponds. Hoffman had installed a bathtub, sink, composting toilet, and a gas line in the tower. The plumbing fixtures were not connected to an approved sewage system. Rather, Hoffman told County staff the holding ponds were for both black water and grey water and that he used the grey water for agricultural purposes. As previously mentioned, above-ground sewage and wastewater holding ponds can create both environmental and public health hazards. Hoffman had also built an addition to the dwelling unit; made other renovations; constructed a small accessory structure out of unreinforced masonry; and built a new 60-foot stone structure which he called a garbage enclosure.

## C.    *Administrative Proceedings*

In June 2011, the County issued violation letters to Hoffman stating it would refer the Cintura property and the Alta property for code enforcement hearings unless Hoffman contacted the County within ten days and arranged to correct the code violations on the properties. Hoffman did not respond. In December 2011, Hoffman was issued nuisance abatement notices and notices to appear with respect to both properties.

At hearings in February 2012 before an administrative law judge (ALJ), Hoffman testified regarding conditions on the properties. According to Hoffman, he and his wife were the only residents on the Cintura property. There was one trailer on the property, which was occupied occasionally by a caretaker or other employee. The Alta property was unoccupied and used to store equipment, furniture, clothing, wine, and tea. Hoffman had operated a tea business on the Cintura property for 40 years. At that point, he and his

8

wife were running a mail order tea business called The Phoenix Collection. Tea was stored in the tea cave, the converted garage, and in small rooms off the garage. The orders were filled on the Cintura property and picked up for delivery at the Alta property. Hoffman also used the Alta property to age teas he had collected from Thailand and China. Hoffman had a business license for the sale of tea at the Cintura property. Hoffman did not have a business license for the Alta property. Although the operation was not open to the public, Hoffman invited people from " 'all over the world' " to taste his tea.

Hoffman held no professional licenses but had done all of the remodeling and construction on the properties himself. He stated that he did try to obtain a building permit for the tea pagoda in 1988 but that it proved " 'unworkable' " because the logs he had used were not up to code. Hoffman admitted he had never obtained a building permit for any of the projects on either property. In 2007, he sent a letter to the County suggesting his properties were exempt from building permits because they were a " 'film set,' " having been filmed as part of a 2007 documentary by Les Blank called *All in this Tea*. He continued to believe he was exempt from building permits on this basis.

Since at least the 1990's, Hoffman has been a proponent of sustainable living through composting of food and human waste. The earthworm is the mainstay of his agricultural system, and he is a proponent of waste disposal through bio-digestion. He claimed he attempted to get his alternative waste disposal system on the Cintura property permitted 40 years ago but was unsuccessful. There was no longer a septic system on the Alta property, and his alternative waste disposal system was not completed. The holding ponds on the Alta property were being used at that point to store water for

9

agricultural uses. Hoffman did not believe there is a natural watercourse on the Cintura property. He was unaware of a natural watercourse on the Alta property, but testified water comes onto the Alta property from the Cintura property following rain. He admitted to diverting water to protect the Alta dwelling unit.

In 2011, Hoffman put together a working team, including an architect, a geotechnical engineer, and a structural engineer to begin the process of bringing the properties into compliance. The architect prepared a hand drawing of all of the structures on the properties, and the geotechnical engineer wrote a report regarding the foundation of one structure. In December 2011, the County deemed the documentation insufficient, as it had requested a survey of all of the structures before any permit could be sought. At that point, Hoffman stopped all attempts at remediation. He conceded, however, that he might "be at fault" and that he has learned after 40 years "he cannot simply build what he wants to build."

In written orders, the ALJ concluded that Hoffman had engaged in numerous code violations for unpermitted construction, retaining walls, composting toilets, and sewage and wastewater holding ponds on both properties. Additional violations were found with respect to construction within 20 feet of the top of a natural watercourse, the unpermitted construction of retaining walls and other structures within a natural watercourse, and the construction of unpermitted wells. The ALJ rejected Hoffman's argument that the temporary use of the properties as a film set exempted him from these requirements. Further, the storage of commercial tea products on the properties violated zoning restrictions for home occupations, as did use of an employee in conjunction with a home occupation without a use permit.

Thus—over 10 years ago, on May 1, 2012—Hoffman was ordered by the ALJ to abate his many violations and public nuisances by, among other things, ceasing to discharge any human waste or wastewater to the surface of the ground within 24 hours; retaining a septic pumper to pump all wastewater from the holding ponds within 10 days; contracting with a professional to determine whether the existing septic system on the Cintura property could be repaired or must be replaced within 30 days; removing unpermitted sewage-related ponds within 45 days on the Cintura property and 90 days on the Alta property; obtaining a septic permit within 90 days for the Cintura property and 120 days for the Alta property; obtaining the necessary permits in order to complete demolition of all unpermitted buildings and other structures within 90 days; and removing all trailers and stored commercial tea.

No occupancy of the properties was permitted until the sewage disposal issues were resolved per the ALJ's orders. In addition, Hoffman was also ordered to pay approximately $31,000 in abatement costs and $97,000 in civil penalties for the Cintura property and approximately $27,000 in abatement costs and $70,000 in civil penalties for the Alta property. Hoffman's petitions for administrative appeal of the ALJ's decisions were denied by the superior court in December 2012, with the court sustaining the ALJ's orders in their entirety.

## D.    *Receivership Proceedings*

In September 2014, the County issued a notice to Hoffman with respect to the properties, directing him to comply with the ALJ's orders within 30 days and informing him that the failure to commence work could lead the County to petition the courts for appointment of a receiver with respect to the

properties.[4]  In October 2015—almost three years after the ALJ's orders were confirmed by the superior court, the court appointed a receiver with respect to the properties, finding them to be substandard and maintained in violation of state law and local ordinance.  Specifically, the court found pursuant to Health and Safety Code section 17980.6 that the violations on the properties were "so extensive and of such a nature that the health and safety of the occupants, neighboring residents, and the general public [was] substantially endangered."  Despite being afforded a reasonable opportunity to correct the violations cited in the ALJ's decisions and orders, Hoffman had not done so.  The court concluded that the substandard conditions and violations would likely persist unless it appointed a receiver "to take possession of [the properties] and undertake responsibility for [their] rehabilitation."

The receiver was granted full powers under section 568 and Healthy and Safety Code section 17980.7, subdivision (c), subject only to the appointment order and any further orders of the court.  Pursuant to the appointment order, the receiver was given broad powers "to the extent necessary to abate any nuisance, rehabilitate the propert[ies], and bring the propert[ies] into compliance with the law," including the powers to: take full and complete possession and control of the properties; to determine the economic and practical feasibility of rehabilitating the structures on the properties or whether demolition or some other method of abating the

---

[4] In fact, when the County conducted a follow-up inspection in June 2014, not only had Hoffman failed to correct any of the violations on the properties, he had completed additional construction on the tea pagoda and an outdoor shower on the Cintura property and had replaced a trailer with an outdoor kitchen, including a stove, refrigerator, and cooking area with a stucco enclosure.  An inspection in December 2014, disclosed Hoffman's construction of a new water collection area on the Cintura property and a new fence on the Alta property.

violations was more appropriate; to enter into contracts, including contracts with real estate agents or appraisers; to sell the properties "if necessary, subject to the prior approval and confirmation of [the] Court," and to "temporarily or permanently relocate" the properties' occupants "if necessary" to implement a rehabilitation plan.

The County had not sought Hoffman's immediate removal from the properties in its petition requesting appointment of a receiver, but it did request the right to seek a removal order from the court if Hoffman interfered with the rehabilitation or if the properties became too hazardous to safely inhabit. In addition, the appointment order expressly instructed the receiver with respect to the ALJ's orders—including specifically the orders that the properties be vacated—that he should investigate the properties and, "[i]n the event the [r]eceiver should determine that the [properties] should be vacated, the [r]eceiver [should] seek specific instructions from the Court by way of a noticed motion."[5] Although orders appointing receivers are made specifically appealable pursuant to section 904.1, subdivision (a)(7), no appeal was taken from this order.

In December 2017, in response to a request for further instructions from the receiver, the court held a hearing with respect to the receiver's mitigation plan for the properties.[6] The court noted that the receiver's duties

---

[5] Thus, contrary to arguments made by Hoffman's appellate counsel during oral argument, the receivership order clearly contemplated the possibility that the properties might need to be sold to bring them into compliance (expressly giving the receiver the power to sell "if necessary," subject to court approval and confirmation) and specifically authorized the receiver to seek Hoffman's removal by noticed motion "[i]n the event the [r]eceiver should determine that the [properties] should be vacated."

[6] In preparation for the hearing, the court conducted a site visit.

13

in this case were "vast" and would likely continue for months if not years. It stated that its instructions would be centered on certain limited tasks immediately confronting the parties and that "clearly" further instructions would be "required over time." The court found the receiver's request to install fences, railings, and gates to remediate "obvious safety hazards" generally "reasonable and necessary." It pointed to one particular structure that presented a safety hazard (and which it appeared Hoffman had been "continuously modifying" in violation of court order), stating that it should be fenced. With respect to two structures on the Alta property that encroached on public land, the court was willing to consider allowing Hoffman to modify or remove them at his expense prior to the receiver seeking their demolition.

The court's written order generally authorized the installation of fences, railings, and gates on the properties. However, Hoffman and his employee were authorized to continue to use the residence and one storage structure on the Cintura property. In addition, the fencing and gates on the Alta property were required to be installed to allow Hoffman access to the interior of the residence and the garden area on that property. Hoffman was prohibited from making the properties open to the general public for "tours or visits." And Hoffman's continued occupancy of the properties was expressly conditioned upon "the termination of construction work" at the properties.

At a hearing for further instructions in September 2018, the court noted that the receivership proceeding was not meant to be punitive. Instead, the "primary end goal" was to restore the properties "to legal status in a feasible and economical manner." The court also recognized "that the community and the County have stated wishes to preserve the propert[ies], and [their] alleged historical architecture, and that such preservation should also guide the restoration efforts." It indicated that it was considering "all

14

relevant facts, including the community interest in saving historically significant structures." Indeed, given the facts before the court at that time, it favored "restoration of the propert[ies] without demolition, if economically feasible." The court expressed openness to an agreement between the County and the Marin Architectural Commission to treat the properties as historically and architecturally significant but stated it could not mandate the relevant governmental entities to do so.

During the September 2018 hearing, the court authorized the receiver to move forward with the demolition of the two structures on the Alta property that encroached on public land, finding it the only feasible solution. Hoffman had been provided with a fair opportunity to address the structures in another manner and had failed to do so. The court also ordered the receiver to examine the properties on a structure by structure basis and prepare recommendations regarding whether the rehabilitation of each such structure could be conducted through application of the State Historical Building Code (Health & Saf. Code, § 18950 et seq.). The receiver was ordered to meet and confer with counsel on this issue and prioritize structures.

At a hearing in March 2019, the court noted the thoroughness of the receiver's "comprehensive report." The report set forth in detail how the State Historical Building Code could be utilized to legalize some or all of the structures on the properties and how the violations of federal, state, and local laws arising from Hoffman's unpermitted diversion of the watercourses running over the properties could be resolved through off-site mitigation. Hoffman requested 90 days to review the report, but stated he was willing to give up the properties. The People's attorney stated she had no objection to

15

the properties being considered historical. The County's primary concern, according to its attorney, was bringing the properties into compliance.

By August 2019, representatives of the Lagunitas Project, a local nonprofit formed to acquire and preserve the properties, appeared in court at a status conference, and the parties discussed progress with respect to a possible compliance agreement and settlement. In December 2019, the court set a mandatory settlement conference for March 2020. At the conclusion of the March 2020 hearing, the court ordered the receiver to file a report discussing the highest and best use of the properties; the value of the properties; and the cost for rehabilitation and restoration of the properties. Hoffman requested and was given the opportunity to file a proposal for bringing the properties up to code but did not do so.

The matter was then continued several times in an attempt to reach a feasible solution for the properties. Hoffman was given another chance to propose an alternate plan for the properties in July 2020, but he did not submit anything to the court. In October 2020, the court expressed the need for this case to be resolved given conditions on the properties. The receiver addressed the court, stating that he had no faith any significant money would be raised to save the properties and that there were no practical solutions to save them. He noted that he had already advanced $20,000 of his own money with respect to the properties and that the waterway issued had not even been addressed. The court advised the receiver to file a request for instructions to bring the properties into compliance, whether by sale or rehabilitation. The court was not optimistic the properties could be rehabilitated and advised Hoffman to prepare to vacate the properties.

The receiver's April 2021 request for instructions asked for authority to take sole possession of the properties and to employ a real estate broker to

market the properties for sale.[7] According to the receiver—while *technically* feasible—a preservation-based rehabilitation approach for the properties was simply not *financially* feasible. The receiver would need access to funds to pay for "the significant amount of technical work needed to inspect, analyze and document the structures and improvements" at the properties and to prepare the necessary "surveys, reports and plans."

There was little, if any, equity in the properties to fund such an approach. As of mid-2020, the fair market value of the properties was estimated at up to $650,000 (Alta property) and $525,000 (Cintura property), valuations which had likely increased. However, the receiver detailed approximately one million dollars in liens, defaulted taxes, and administrative creditors' claims with respect to the properties. It appeared Hoffman was either unwilling or unable to provide for the rehabilitation costs. Moreover, despite "considerable efforts" through a "sophisticated fund[]raising and education program," the Lagunitas Project had raised only a small percentage of the over one million dollars it acknowledged it would need to preserve the properties. Finally, although Hoffman had been given several chances to submit an alternate rehabilitation plan, he had not done so and had not been in communication with the County or the receiver since October 2020.

The receiver opined that he had done everything reasonably possible to facilitate a preservation-based rehabilitation plan for the properties with Hoffman and the Lagunitas Project and that that there was no significant public funding available for such an approach. He believed his proposed plan

_____

[7] Mindful of Hoffman's age and health, the receiver had delayed filing the request until after the local COVID stay-at-home order expired, Marin County moved to orange COVID status, and vaccinations were available.

17

of seeking a buyer for the properties was not just preferable, it was the *only* viable plan for their rehabilitation. With respect to Hoffman's continued presence on the properties, the receiver stated it would be "entirely unrealistic" to assess, list, and show the properties with Hoffman in residence. The receiver noted that he had never inspected the interiors of several unpermitted structures on the properties because Hoffman declined to give him access. Moreover, Hoffman continued to construct improvements on the properties despite court orders enjoining him from doing so. The receiver, real estate agents, consultants, demolition contractors, and potential purchasers would require unfettered access to the properties.

Hoffman opposed the requested orders on a plethora of grounds, including that they were premature because there was no receivership plan, rehabilitation plan, or financing plan in place for the properties. He acknowledged, however, that a feasible compliance plan could not be developed by the receiver "until data regarding rehabilitation work, valuation, sale pricing, finances, and funding [could] at least be estimated." Hoffman also argued that the receiver had not established it was necessary to evict him from the properties and stop him from conducting his tea business there, although he recognized "there may eventually come a time when [he] must vacate the propert[ies] (either temporarily or permanently)." And he expressed concern regarding the solvency of the receivership and the financial feasibility of a sale-based plan. According to Hoffman, the Lagunitas Project remained committed to developing a preservation-based plan for the properties.

On May 21, 2021, the superior court held a hearing which culminated in the order appealed from in this case.[8] It was noted throughout the hearing that any proposed sale of the properties would be subject to further court order. Hoffman's attorney stated that the Lagunitas Project remained involved and might "at the end of the day, wind up being the buyer that comes in." The court agreed that, given the complexities of the properties, the receiver might not find a buyer, and the Lagunitas Project could "come in and offer pennies on the dollar and maybe get a bargain," but that they wouldn't know the options without listing the properties. With respect to Hoffman's continued occupancy, his attorney commented he had so many possessions at the properties it would take 5 months for him to move out, and the receiver stated it was infeasible to try to market the properties with Hoffman and all of his possessions there.

The court commented that it felt deeply for Hoffman and had throughout the proceedings. It addressed him directly, stating: "[Y]ou have been before me for more than five-and-a-half years now. You have come before me wearing your heart on your sleeve begging for me to exercise discretion to allow you to stay and to try and find every possible way to preserve the property that you built." The court opined, however, that it and the receiver had "done all humanly possible, but for taking out a checkbook

---

[8] Both parties cite to the reporter's transcript for this hearing in their supplemental briefing filed after this case was remanded to us by the Supreme Court. We did not have the benefit of this transcript when we initially dismissed this appeal because it had not yet been filed as part of the appellate record. However, we find it relevant to the issues involved in this motion and therefore, to the extent not automatically included it the record before us, we take judicial notice of the reporter's transcript as well as the portions of record below which have been provided to us by the parties in their motion pleadings. (Evid. Code, §§ 452, subds. (c) & (d), 459, subd. (a).)

and writing you a check for $1 million to be able to save the propert[ies]." It concluded its choices at that point were limited and it "would be foolish to suggest that it's not time to sell the propert[ies] and that we can do something else." And it stated that, in ordering him to leave, it was simply effectuating the orders that had been in place for years. The court reflected that, when it did its site visit in 2017, there was wet cement, new redwood fencing, and construction going on in the tea house despite those orders. While it expressed hope that the Lagunitas Project could "enter into the mix," the court stated it could "barely see the line in the sand" because the line was so far behind it.

In its written order, the court found that it was "reasonable and necessary" for the receiver to take "full and sole physical possession" of the properties and "to retain a real estate broker to assess, value, list and market" the properties. Thus, pursuant to the order, the receiver was instructed to take full and sole physical possession of the properties; Hoffman was ordered to vacate the properties, and to cause all other persons to vacate, within 90 days of the entry of the order; and the receiver was instructed "to retain a real estate broker to assess, value, list and market" the properties in order to "secure sales of them for approval and confirmation by the Court." Hoffman filed a timely notice of appeal from this order.

The County moved to dismiss, arguing that Hoffman was challenging a non-appealable interim order. After opposition, we agreed with the County and dismissed the appeal, finding the collateral order doctrine inapplicable on these facts. In February 2022, the Supreme Court granted review in the case, directed us to vacate our dismissal order, and asked us to "show cause" why the order at issue was not appealable as a collateral order. Having

reviewed the matter a second time, we reaffirm our prior conclusion and again dismiss the appeal.

## II.

## DISCUSSION

### A.    *Legal Framework*

"[Health and Safety Code] [s]ection 17980.7 authorizes the judicial appointment of a receiver in situations where substandard conditions on a property substantially endanger the health and safety of the public, and the property owner has been unable or unwilling to remediate those conditions. The law permits the appointment of a receiver to assume control of the property and abate the nuisance conditions or to take other appropriate actions as may be authorized by the court." (*County of Sonoma v. Quail* (2020) 56 Cal.App.5th 657, 671–672.)  A superior court's orders in receivership proceedings rest upon that court's " 'sound discretion exercised in view of all the surrounding facts and circumstances and in the interest of fairness, justice[,] and the rights of the respective parties.  [Citation.]  The proper exercise of discretion requires the court to consider all material facts and evidence and to apply legal principles essential to an informed, intelligent, and just decision.  [Citation.]  Our view of the facts must be in the light most favorable to the order[,] and we must refrain from exercising our judgment retrospectively.'  [Citations.]  Where there is no evidence of fraud, unfairness, or oppression, the court has wide discretion in approving the receiver's proposed actions." (*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 931 (*Gonzalez*); accord, *Quail*, at p. 671; *City of Sierra Madre v. SunTrust Mortgage, Inc.* (2019) 32 Cal.App.5th 648, 657–658, 660.)  Indeed,

21

"[s]uch deference is the rule, even where the court confirms extraordinary action by the receiver, such as a sale of real property." (*Gonzalez*, at p. 931.)

Here, however, we are considering whether a particular order in a receivership proceeding is appealable pursuant to the collateral order doctrine. "[W]e are 'dutybound to consider' appealability." (*Pacific Fertility Cases* (2022) 78 Cal.App.5th 568, 576.) And, if jurisdiction is lacking, we " 'must dismiss.' " (*Ibid.*) Such a jurisdictional question, when based on undisputed facts, is subject to our de novo review. (*Saffer v. JP Morgan Chase Bank* (2014) 225 Cal.App.4th 1239, 1248; *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 42 ["Where the evidence is not in dispute, a determination of subject matter jurisdiction is a legal question subject to de novo review"].) Nevertheless, we must necessarily consider the context in which the challenged order arose in the exercise of our independent review of this legal question.

"The right to appeal in a civil case is conferred exclusively by statute." (*Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1083 (*Smith*), quoting *Powers v. Richmond* (1995) 10 Cal.4th 85, 109.) Generally, only final judgments are appealable. (See *Sullivan v. Delta Airlines* (1997) 15 Cal.4th 288, 304.) "A judgment is the final determination of the rights of the parties in an action or proceeding." (§ 577.) "Under the final judgment rule, ' " 'There can be but one final judgment in an action, and that is one which in effect ends the suit in the court in which it is entered, and finally determines the rights of the parties in relation to the matter in controversy' [citations]. A judgment is final 'when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined.' " ' " (*San Joaquin County Dept. of Child Support Services v. Winn* (2008) 163 Cal.App.4th 296, 300 (*Winn*).) "It is the substance and

22

effect of the judgment which determines its finality.  (*Brown v. Memorial Nat.'l Home Foundation* (1958) 158 Cal.App.2d 448, 453.)

As this District summarized decades ago in *Kinoshita v. Horio* (1986) 186 Cal.App.3d 959 (*Kinoshita*), numerous policy considerations undergird the one final judgement rule.  For instance, there is "the obvious fact that piecemeal disposition and multiple appeals tend to be oppressive and costly. (*Id.* at p. 966.)  Moreover, "[i]nterlocutory appeals burden the courts and impede the judicial process in a number of ways: (1) They tend to clog the appellate courts with a multiplicity of appeals.  Whether or not the earlier ruling is appealed, later ones will certainly be appealable.  [Citations.]  (2) Early resort to the appellate courts tends to produce uncertainty and delay in the trial court. . . .  (3) Until a final judgment is rendered the trial court may completely obviate an appeal by altering the rulings from which an appeal would otherwise have been taken.  [Citations.]  (4) Later actions by the trial court may provide a more complete record which dispels the appearance of error or establishes that it was harmless. (5) Having the benefit of a complete adjudication by the trial court will assist the reviewing court to remedy error (if any) by giving specific directions rather than remanding for another round of open-ended proceedings."  (*Id.* at pp. 966–967.)

In contrast, "[t]hose whose rights and obligations depend on the judgment are best served by a single complete and final resolution of the issues presented.  A right to an interlocutory appeal permits a party who benefits from delay to frustrate the goals of promptness and certainty of adjudication.  The possibility that an order is appealable can produce delay even where no one *wants* to impede the litigation.  If the ruling *is* appealable, the aggrieved party *must* appeal or the right to contest it is lost.  [Citations.] Thus every exception to the final judgment rule not only forges another

23

weapon for the obstructive litigant but also requires a genuinely aggrieved party to choose between immediate appeal and the permanent loss of possibly meritorious objections." (*Kinoshita, supra*, 183 Cal.App.3d at p. 967.) "For all these reasons, exceptions to the one final judgment rule should not be allowed unless clearly mandated." (*Ibid.*)

Section 904.1 codifies the one final judgement rule. (§ 904.1, subd. (a) [an appeal may be taken from the superior court "[f]rom a judgment, except an interlocutory judgement."] The provision also contains a list of statutory exceptions to that rule. (§ 904.1, subds. (a)(1)-(14).) "Section 904.1 serves to avoid piecemeal litigation by limiting appeals to final judgments, postjudgment orders, and certain enumerated orders." (*Smith, supra*, 208 Cal.App.4th at p. 1083.) As mentioned above, for instance, pursuant to subdivision (a)(7) of section 904.1, an appeal may be taken from an order appointing a receiver, even though it is not a final judgment. The receivership order at issue here, in contrast, is not a final judgment; nor is it one of the orders specifically made appealable by section 904.1. (*Smith, supra*, 208 Cal.App.4th at p. 1083.)

However, the collateral order doctrine exists as a common law exception to the one final judgment rule pursuant to which "some interim orders are deemed appealable 'judgments' because they are essentially the same as a final judgment." (*Reddish v. Westamerica Bank* (2021) 68 Cal.Ap.5th 275, 278; see *Smith, supra*, 208 Cal.App.4th at p. 1084 [the collateral order doctrine is a well-recognized "exception to the 'one final judgment' rule codified in . . . section 904.1"].) Pursuant to the doctrine, an interim order is appealable if: (1) it is collateral to the subject matter of the litigation; (2) it is final as to the collateral matter; and (3) it directs the payment of money by the appellant or the performance of an act by or against

24

the appellant. (*Marsh v. Mountain Zephyr* (1996) 43 Cal.App.4th 289, 297–298, citing *Sjoberg v. Hastorf* (1948) 33 Cal.2d 116, 119; accord, *Reddish*, at p. 278; (*Koshak v. Malek* (2011) 200 Cal.App.4th 1540, 1545 (*Koshak*).) In other words, under the collateral order rule, " 'an appeal will lie from [a] collateral order even though other matters in the case remain to be determined,' but that exception applies *only* '[w]here the trial court's ruling on a collateral issue "is substantially the same as a final judgment in an independent proceeding" [citation], in that it leaves the court no further action to take on 'a matter which . . . is severable from the general subject of the litigation.' " ' (*Winn, supra,* 163 Cal.App.4th at p. 300.)

"A matter is collateral when it is 'distinct and severable from the general subject of the litigation.' " (*Steen v. Fremont Cemetery Corp.* (1992) 9 Cal.App.4th 1221, 1227 (*Steen*).) In contrast, "[i]f an order is ' "important and essential to the correct determination of the main issue" ' and ' "a necessary step to that end," ' it is not collateral." (*Winn, supra,* 163 Cal.App.4th at p. 300.) An interim order is not final if further judicial action is required with respect to the matters addressed by the order. (*Koshak, supra,* 200 Cal.App.4th at p. 1545.) In other words, the order must be " 'dispositive of the rights of the parties in relation to the collateral matter.' " (*Ibid.*) As this Division noted almost a century ago, " 'A judgment that is *conclusive* of any question in a case is final as to that question.' " (*Colma Vegetable Assoc. v. Superior Court* (1925) 75 Cal.App. 91, 95, italics added.)

For example, in *Winn,* an alleged father appealed from a superior court order in a child support proceeding requiring him to submit to genetic testing. (*Winn, supra,* 163 Cal.App.4th at p. 298-299.) The appellate court concluded that the collateral order doctrine did not apply because the genetic

25

testing order was "not severable from the general subject matter of the litigation, which is to establish whether Winn is the father of the children and to obtain an order that he pay child support." (*Id.* at p. 300.) As to finality, *Gunder v. Gunder* (1929) 208 Cal. 559 is instructive. In that case, the Supreme Court dismissed an appeal from an order settling the basic issues in a marriage dissolution proceeding and referring the matter to a referee for an accounting. (*Id.* at pp. 559–561.) In finding the referral order non-appealable, the Court reasoned: "It is apparent upon the showing made in this case that the judgment is not and was not intended by the court to be a final determination of the controversy in the trial court but that final judgment as to the issues adjudicated was reserved by the court to be entered upon the submission of the referee's report, which would then be subject to 'the court's approval,' and at which time the court would also render its 'final judgment in favor of said plaintiff and against said defendant in such amount as the court may find that the plaintiff is entitled to.' " (*Id.* at p. 562; see also *Kinoshita*, *supra*, 183 Cal.App.3d at p. 964 [noting the " 'now settled rule' " that the types of orders at issue in *Gunder* are not appealable].)

## B.     *The Order at Issue is not Appealable*

There is little disagreement between the parties regarding the law applicable to this dispute. Nevertheless, the County argues that the receivership order at issue is not appealable pursuant to the collateral order doctrine because it does not deal with a collateral matter, it does not require the payment of money or performance of an act by Hoffman, and it is not a final disposition of the matters covered in the order. Hoffman, on the other hand, asserts that the collateral order doctrine does authorize this appeal because the order requires him to perform an act, moving off the properties; involves matters collateral to the main issue in the proceedings, possession

26

and sale of the properties; and is a final resolution of those matters. As discussed below, we agree with the County that the challenged receivership order is neither collateral to the main purpose of the underlying receivership nor final with respect to the issues it addresses. We therefore again dismiss this appeal. Although we tend to agree with Hoffman that the receivership order—by requiring him to move off the properties, at least temporarily—does require the performance by him of an act, we need not reach this issue because Hoffman has failed to persuade on the other two factors necessary for application of the collateral order doctrine.[9]

### 1. *The Order is not Collateral*

As the superior court made clear at a hearing for further instructions in September 2018, the "primary end goal" of these receivership proceedings is to restore the properties "to legal status in a feasible and economical manner." Hoffman concedes as much. He argues, however, that the court's order instructing the receiver "to retain a real estate broker to assess, value, list and market" the properties in order to "secure sales of them for approval and confirmation by the Court" is collateral to the issue of abatement. To the contrary, the possibility that the properties might need to be sold in order to effect their remediation has been contemplated since the court appointed the receiver back in 2015. In its appointment order, the court granted the

---

[9] The County argues at length that Hoffman was not directed to take any "new" action by the challenged receivership order because he had already essentially been deprived of possession of the properties through existing court orders, subject only to notice of physical removal by the court. We do find the fact that Hoffman had only contingent and limited rights to physical possession of, and/or access to, portions of the properties relevant to the question before us. However, we consider it in the context of our finding below that the receivership order was not collateral to the main subject matter of this litigation, the remediation of the properties.

receiver numerous powers "to the extent necessary to abate any nuisance, rehabilitate the propert[ies], and bring the propert[ies] into compliance with the law," including the power to sell the properties "if necessary, subject to the prior approval and confirmation of [the] Court."

It can hardly be said that the court's order instructing the receiver to explore the parameters of a possible sale was unrelated or somehow ancillary to the underlying goal of abatement. Rather, it was a critical step towards remediation, taken only after the court and the receiver—over the course of years—took numerous actions attempting to prioritize a preservation-based remediation plan for the properties. As the court remarked at the May 2021 hearing, both it and the receiver had "done all humanly possible, but for taking out a checkbook and writing [Hoffman] a check for $1 million to be able to save the propert[ies]." Exploring remediation through sale thus became essential to restoring the properties "to legal status in a feasible and economical manner."

Similarly, from the beginning of this receivership action, Hoffman's physical possession and use of the properties has always been tied to, and contingent on, the need for their remediation. Although it did not ask that Hoffman be immediately removed from the properties in its receivership petition, the County did request the right to seek a removal order from the court if Hoffman interfered with their rehabilitation or if the properties became too hazardous to safely inhabit. And the court expressly instructed the receiver to investigate the properties and seek specific instruction if he "determine[d] that the [properties] should be vacated." Thereafter, Hoffman's ability to use the properties was substantially reduced for health and safety reasons while the receiver and the court pursued a feasible remediation plan. Once it was determined that sale of the properties should be explored,

28

ordering Hoffman (and his extensive possessions) to be removed from the properties so that they could be effectively marketed for a possible sale was simply the next step in the underlying abatement goals of the receivership action. As the court, itself, stated, ordering Hoffman to leave was simply effectuating the orders that had been in place for years. We thus conclude that decisions regarding Hoffman's occupancy of the properties were not " 'distinct and severable from the general subject of the litigation.' " (*Steen, supra*, 9 Cal.App.4th at p. 1227.)

2. *The Order is not Final as to Either Possession or Sale*

Even more evident, the receivership order is not final as to either of the two issues it addresses. As stated above, the possibility that the properties might need to be sold in order to effect their remediation had long been contemplated, and the court's order simply instructed the receiver "to retain a real estate broker to assess, value, list and market" the properties in order to "secure sales of them for *approval* and confirmation by the Court." (Italics added.) As its comments during the May 2021 hearing made clear, the court fully expected to revisit the issue before settling on a specific plan with respect to the ultimate disposition of the properties.

The court first identified options which might come before it, including a buyer who wants to buy empty lots, a buyer who wants the properties "as is" with plans to level them, a buyer who wants to preserve them, and/or a buyer who wants to work with the County on their remediation and post a bond. But the court did not know what options would be available and "it would be silly for [it] to flip a coin and decide which option [the receiver] should go with before we know what buyers are out there." The court went on to state: "I would presume that if [the receiver] finds a buyer who says, 'I want this property for X number of dollars, clear lot,' [the receiver] is going to

come to me and say, 'I [have] a buyer and we need instruction to clear the lot,' or if he comes to me and says, 'I have a buyer who wants the property as is and the buyer is committed to bringing the buildings up to historical building code and has met with the County, and they are in agreement as to what needs to be done to bring it up to historical building code, and the buyer is prepared to post a bond to convince the County that it's going to be brought up to building code,' then [the receiver] will bring me in a request to approve that." It later reiterated: "I have to approve it before it's sold, anyway, so I would have to approve any sale."

In this way, these proceedings are distinguishable from those in both *Fish v. Fish* (1932) 216 Cal.14 (*Fish*) and *City of Riverside v. Horspool* (2014) 223 Cal.App.4th 670 (*Horspool*). In *Fish*, the petitioner had appealed from an order "settling the receiver's account, fixing his compensation and that of his attorney, directing a named commissioner to sell, subject to confirmation, certain property in the receiver's hands to pay said fees, directing the disposition to be made of the balance of the proceeds derived from such sale, and ordering the discharge of the receiver and the release of his surety." (*Fish*, at p. 15.) In an opinion granting a petition for writ of supersedeas, the court noted that the commissioner was reportedly threatening to sell the property while the appeal was pending. (*Ibid.*) The court found the order appealable as a collateral order, opining: "The order for the sale of the receivership property, for the purpose designated, is certainly an order 'for the doing of an act against' petitioner, because, if carried into execution, it will deprive her of a portion of the property or the proceeds derived from the sale thereof." (*Id.* at p. 16.) Under the circumstances, the court did not find the fact the sale was still subject to court confirmation dispositive, noting: "Obviously, such a reservation does not affect the finality of that portion of

30

the order fixing the compensation of the receiver and his attorney and directing a sale of the property to pay the same." (*Id.* at p. 17.)

Like this case, *Horspool* involved a nuisance abatement action in which the appointment of a receiver was sought pursuant to Health and Safety Code section 17980 et seq. (*Horspool*, *supra*, 223 Cal.App.4th at p. 673.) The receiver requested an order approving the sale of the property. The owners' actions had made it impossible for the receiver to obtain financing for the rehabilitation of the property. Thus, "an as-is sale to an investor-buyer with the personal resources and willingness to complete repairs was the best option." (*Id.* at p. 677.) The receiver had identified a buyer who was "willing to purchase the . . . property, 'as is,' for $75,000, and to fund the cost of repairs, under the oversight of the receiver." The court approved the sale of the property " 'as is,' free and clear of all liens and encumbrances." (*Ibid.*) On appeal, the appellate court opined that the sale order was appealable as a collateral matter involving the sale of assets. (*Id.* at p. 683.) The matter was also moot because the sale of the property had become final due to the appellant's inaction in obtaining an undertaking to stay the trial court proceedings. (*Id.* at p. 685.)

The receivership order in this case is much more preliminary than those at issue in *Fish* and *Horspool*. No sale has been approved by the court, and there are multiple possibilities regarding the terms and consequences of any such future sale. Indeed, there is a question, given the complexities of the properties, whether a buyer can even be found at all. Since it is clear that further judicial action must still be taken with respect to the approval and permitted terms of any sale, the challenged receivership order is not final as to sale of the properties.

For similar reasons, the order that Hoffman vacate the properties is not final on the issue of possession. As we noted above, Hoffman's physical possession and use has always been contingent on the remediation plans for the properties. The court made its May 2021 order because it concluded that the time had come to ready the properties for possible sale and that it was not feasible to market the properties with Hoffman in residence. But the future of the properties is entirely unclear. As the court itself noted, the receiver might not find a buyer, and the Lagunitas Project could "come in and offer pennies on the dollar and maybe get a bargain." Or the receiver might be unable to find any buyer. Under either scenario, Hoffman might be able to regain physical possession of at least portions of the properties as an artist in residence or as the owner. Since it is not clear that the order removing Hoffman from the properties is dispositive regarding his rights to possession, it is not final for purposes of the collateral order doctrine.

Having concluded that the receivership order is neither final nor collateral, we dismiss the appeal. In taking this action, we recognize that we could treat this appeal as a petition for extraordinary writ and reach the merits of Hoffman's challenges to the receivership order. We decline to do so for all of the reasons discussed herein. " 'The interests of clients, counsel, and the courts are best served by maintaining, to the extent possible, bright-line rules which distinguish between appealable and nonappealable orders. To treat the instant appeal as a writ application would obliterate that bright line and encourage parties to knowingly appeal from nonappealable orders, safe in the knowledge that their appeal will be "saved by the appellate courts." We cannot condone or encourage such practice.' " (*Winn*, *supra*, 163 Cal.App.4th at p. 301.)

Hoffman is, beyond doubt, an exceedingly sympathetic individual who has achieved many extraordinary things in his lifetime.  However, as stated above, in receivership proceedings such as this, the superior court is required to weigh the equities of the case based on all materials facts and relevant legal principles, exercising its discretion to make "informed, intelligent, and just" decisions.  (*Gonzalez*, *supra*, 43 Cal.4th at p. 931.)  We see no valid reason to interfere prematurely in this complex, equitable process, and many reasons such an unduly proactive approach could interfere with the superior court's ability to reach the best and timeliest solution "in the interest of fairness, justice[,] and the rights of the respective parties."  (*Ibid.*)

## III.
## DISPOSITION

The appeal is dismissed.  The parties shall bear their own costs on appeal.

WISS, J.*

WE CONCUR:

MARGULIES, ACTING P.J.

BANKE, J.

A163281N

---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.